[No. A113662. First Dist., Div. Two. Nov. 2, 2007.]

MOHAMMAD KASHMIRI et al., Plaintiffs and Respondents, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Appellant.

## COUNSEL

Charles F. Robinson, Jeffrey A. Blair, Christopher M. Patti, Michael R. Goldstein, James Ernst Holst; Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Ethan P. Schulman and Keith D. Kessler for Defendant and Appellant.

Brown, Goldstein & Levy, Andrew D. Freeman, Deborah T. Eisenberg, Staci J. Krupp; Altshuler, Berzon, Nussbaum, Rubin & Demain, Jonathan Weissglass and Danielle E. Leonard for Plaintiffs and Respondents.

Jon N. Ekdahl, Leonard A. Nelson, Barat S. McClain; and Catherine I. Hanson for American Medical Association and California Medical Association as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**LAMBDEN, J.**—Mohammad Kashmiri, Benson R. Cohen, Anupama K. Menon, Sally Schwettmann, John Alden, Janet Lee, Teddy Miller, and Jennifer Blake, individually and on behalf of a class of similarly situated persons (collectively, respondents), filed an action for injunctive and declaratory relief and for damages against The Regents of the University of California (the Regents or University) after the University increased various fees. The University asserts that it did not breach any contract with the students and, even if it did, this court should reduce the damages by the amount of grant money provided by the University to the students.

██  We conclude that implied contracts were formed between the University and respondents. The University breached its contracts with the professional students when it raised the professional educational fees for continuing students after promising on its Web site and in its catalogues that such fees would not be raised for the duration of the students' enrollment in the professional program. The University also breached its contracts with the students attending the spring and summer sessions in 2003 by raising the educational fees for these terms after the students had received bills specifying the exact amount to be paid. We also reject the University's challenge to the damages award, since the record contains no facts to establish the amount the University now claims should be deducted from the award. Accordingly, we affirm the judgment of the lower court.

## BACKGROUND[1]

The Regents set and receive the educational fees for all students attending the University (or UC).[2] On January 21, 1994, the Regents approved a fee policy that included an educational fee for all UC students and a professional degree fee (PDF) for some UC graduate students.

*The PDF*

For the 1994–1995 academic year, the Regents imposed a PDF on all students in graduate professional degree programs, including dentistry, veterinary medicine, business/management, law, and medicine. In the 1996–1997 academic year, the University also charged the PDF for students enrolled in graduate programs in nursing, optometry, pharmacy, and theater, film, and television.

The PDF policy approved in January 1994 stated that the following factors would be considered when assessing the PDF: "the amount of resources required to sustain academic quality at, and enrollments in, the particular professional program; the ability of UC to remain competitive with other institutions; the cost of education for each specific program; the average fees charged by comparable public and private institutions for each specific program; overall State General Fund support for the University; and other market-based factors that permit University programs to compete successfully for students." Additionally, the policy called for the PDF to "be phased in

---

[1] The parties settled almost all of the underlying facts relevant to this summary judgment. Most of the facts set forth in this decision are from the parties' amended stipulated statement of facts admitted as true.

[2] The various UC institutions charging fees at issue in this lawsuit are: UC Berkeley, UC Davis, UC Irvine, UC Los Angeles (UCLA), UC Riverside, UC San Diego, UC San Francisco (UCSF), UC Santa Barbara, and UC Santa Cruz.

over time so that the total fees charged to students enrolled in each of the five professional programs be similar to the average fee charged for that program by comparable, high-quality institutions across the nation." At least one-third of the total fee revenue was to be "used to provide supplemental financial aid, including loan forgiveness programs, to help maintain the affordability of a professional school education . . . ."

When approving the professional fee policy, the Regents declared that "the level of the [PDF] remain the same for each student for the duration of his or her enrollment in the professional degree program, with increases in the fee applicable to new students only, until such time as the fee for each professional program reaches approximately the average of fees charged for that program by comparable high-quality institutions across the nation."

The office of the president of the university maintains on its Web site an annual guide to student fees and deposits, described as " 'the official guide for all University departments in the area of general University fees and deposits and miscellaneous University fees for which Regental or Presidential approval is required.' " Immediately following the foregoing language is the phrase, in bold font, "Fees are subject to change without notice." Following this phrase are links to specified fees and other topics, including "Fee for Selected Professional School Students." At the Web pages for the professional school students during the academic years of 1994–1995 to 2002–2003, the following statement was posted: "Increases in the Fee apply to new students only. The Fee will remain the same for each student for the duration of his or her enrollment in the professional degree program." The particular schedules of the PDF were posted on the Web site of the office of the president of the university.

Additionally, from the academic year of 1994–1995 through the academic year of 2002–2003, the University's annual budget documents provided: "Until the fee is fully phased in, the level of the [PDF] remains the same for each student for the duration of his or her enrollment in the professional degree program, with increases in the fee applicable to new students only."

The catalogues for Boalt Hall School of Law (Boalt) at UC Berkeley for the academic years of 1999–2000 and 2000–2001 stated the following: "The [PDF] is one component of the total fees for J.D. students. For students entering in [1999 or 2000], the [PDF] is $6,000 per year, and it will remain at that level for their three years in the J.D. program. Other components of total fees, however, could change." Similarly, the Boalt catalogues for the academic years of 2001–2002 and 2002–2003 provided: "All students who enter the J.D. Program pay tuition and fees. The [PDF] is one component of the total fees. The professional degree fee remains at the same level for the three

years in which the student is enrolled in the program. Other components of total fees, however, could change."[3]

In addition to the various catalogues and the University's Web site admonishing that fees were subject to change,[4] many catalogues for the professional schools cautioned that policies could be changed. Thus, Boalt's catalogues for the academic years of 2001–2002 and 2002–2003 provided: "[UC] Berkeley reserves the right to add, amend, delete or otherwise modify its policies, information, rules and regulations. This includes, but is not limited to, the modification of its degree programs or courses of study; its rules affecting the admission and retention of students, or the granting of credit and degrees; the academic calendar, course offerings or course content; and its fees, tuition and other charges, whenever it deems such changes desirable or necessary." Similarly, the UC Davis School of Law catalogues for the academic years of 2001–2002 and 2002–2003 contained the following language under the heading "Costs of Education": "Tuition and fees are subject to legislative and gubernatorial action—they may change without notice."[5]

*PDF Charged*

From 1994 until the 2002–2003 academic year, the University did not raise the PDF for continuing students. The PDF was increased three times during this period, but the increases applied only to incoming students. On December 16, 2002, the Regents approved increases in the PDF for the spring 2003 term for all professional students, both incoming and continuing students. The increases were as follows: $150 for nursing and theater, film, and television; $250 for pharmacy and optometry; $350 for veterinary medicine; and $400 for medicine, business, law, and dentistry.

On July 17, 2003, the Regents voted to increase the PDF by 30 percent for the academic year of 2003–2004, for continuing as well as for newly

---

[3] Similar assurances regarding the PDF were announced in the medicine bulletin for UCSF, the catalogues and Web sites for the UCSF School of Nursing, the Web site for the UC Davis School of Medicine, and Boalt's student resource guide for the academic year of 2003–2004.

[4] Boalt's student resource guide noted that all fees in its table of estimated costs were "[s]ubject to change without notice." Similarly, the catalogue for UC Irvine for the academic year of 2002–2003 stated that "[a]ll fees are subject to change without notice, and the University may impose additional fees." The Web site for the UCSF School of Nursing advised: "Fees are subject to change, particularly in times of economic uncertainty. UC is a publicly-supported institution and receives a portion of its budget from the state government."

[5] The UCLA School of Law bulletin for the academic years of 2001–2002, 2002–2003, and 2003–2004 included the following warning: "Note: This bulletin is neither a contract nor an offer of a contract. Fees, deadlines, academic requirements, courses, degree programs and other matters described in this bulletin may change without notice. Not all courses are offered each academic year, and faculty assignments may change. All announcements herein are subject to revision. . . ."

enrolled students. For this academic year, the Regents charged the following PDF, no matter when the student entered the program: law, $9,473; medicine, $8,173; business, $9,360; dentistry, $8,060; veterinary medicine, $6,565; pharmacy, $4,875; optometry, $4,875; nursing, $2,925; and theater, film, and television, $3,185. Approximately 6,315 continuing professional degree students were impacted by the increase in the PDF.

The Regents again authorized an increase in the PDF for the academic year of 2004–2005, for both incoming and continuing students. These increases were as follows: $4,500 for business, medicine, and dentistry; $4,000 for veterinary medicine; $3,800 for law, pharmacy, and optometry; and $2,600 for theater, film, and television. The lowest PDF charged was $2,925 for nursing students and the highest was $15,792 for business students at UCLA. For the academic year of 2005–2006, the Regents increased the PDF by 3 percent above the fee of the prior year.

*Educational Fee*

The educational fee is a mandatory charge assessed against each student attending UC. In press releases the University warned students that further fee increases were likely and that the fees would depend upon the budget situation. In January 2003, the University posted on its Web site questions and answers regarding student fees. It advised, "The governor's budget proposal for 2003–04 assumes these [PDF's] will rise further in fall 2003" and that "further student fee increases in 2003–04 are likely given the severity of the state's budget situation and the University's commitment to protecting student instructional programs from cuts."

In November and early December 2002, the University billed students for the spring term. The billing statements confirmed each student's enrollment for the spring semester and set forth the specific amount that had to be paid by the applicable deadline. The billing statements did not warn that the price billed for the semester was subject to change. On December 16, 2002, the Regents approved a $135 fee increase for each student for spring 2003.[6] No spring 2003 student received individualized notice of an increase prior to receiving the original bill. Students started their spring semester in January 2003, and some students did not receive any notification about the increase until after they started spring classes. Between December 18, 2002, and February 5, 2003, the University notified students by e-mail of the higher educational fee, and subsequently sent them a written notice.

---

[6] Most students had already paid their bills before being informed of the increased fee, and almost all had started classes for the spring 2003 term prior to the University's notifying them of the fee increase.

Similarly, students were sent their bills for the summer 2003 session in February 2003, and the bills set forth a specific price that the student needed to pay by a certain deadline. In May 2003, after the students had been billed for the summer term, the Regents increased the summer 2003 fees by a range of $160 to $182 per student at UC Berkeley and $18 per unit at UCLA. The students received no individualized warning or notice of increased fees prior to the receipt of their bills. All of the in-state summer 2003 students at UCLA and UC Berkeley received individual notices of the fee increases prior to the deadline to withdraw from summer sessions with a full refund.

*Filing the Lawsuit*

On July 24, 2003, respondents—eight current or former UC students—filed this action on behalf of three subclasses of students. In August 2004, respondents filed their first amended complaint for injunctive and declaratory relief and damages. They asserted a breach of contract claim on behalf of the professional student subclass, a breach of contract claim on behalf of the spring 2003 student subclass, and a breach of contract claim on behalf of the summer 2003 student subclass.

The superior court certified three stipulated subclasses. The professional student subclass consisted of all students subjected to the PDF charge who first enrolled in their respective professional degree programs prior to December 16, 2002, and who paid an increased PDF after that date. The spring 2003 student subclass encompassed any students at UC who were billed, assessed, or charged fees for the spring 2003 semester prior to receiving individualized notice that the educational and/or PDF would be increased for that semester and whose educational and/or PDF were increased subsequent to that bill, assessment, or charge. Finally, the third subclass was comprised of the summer 2003 students. This subclass included any students at UC Berkeley or UCLA "who were billed, assessed, or charged fees for the summer 2003 session prior to receiving individualized notice that the per-unit and/or per-student fees would be increased for that session and whose per-unit and/or per-student fees were increased subsequent to that bill, assessment, or charge."

*Summary Judgment Motions*

In the summer of 2004, respondents and the Regents filed cross-motions for summary judgment. In support of their motion for summary judgment, respondents submitted declarations stating that the unexpected fee increases significantly affected them. For example, a Boalt student withdrew from his fall 2003 semester classes because he did not have the funds to pay the increase; he returned to Boalt for the spring 2004 semester. Another Boalt

student did not participate in a planned externship at a nonprofit legal services organization but applied for part-time jobs in order to be able to pay the fee increase.

The trial court denied both summary judgment motions on January 24, 2005. The court denied the Regents' motion on the merits. The court denied respondents' motion because they failed to show they could prevail on an entire cause of action. They produced evidence to support the element of breach for each of their three contract claims, but they did not try to prove the amount of their alleged damages.

Subsequently, with regard to the issue of damages, the parties stipulated that the total fee increases "were not paid in full by all members of the affected" subclasses, because some members received scholarships, fellowships, grants and/or fee remissions "that paid or reimbursed, in whole or in part, the challenged increases" in the PDF and/or educational fee. According to the director of student financial support in the office of the president of the university, the receipt of aid resulted in many students not paying any fees. The director also reported that approximately 25 percent of the professional students did not receive gift aid and used their own resources or loans to pay the increases.

The parties entered into stipulations preserving the Regents' legal positions, but permitting the superior court to resolve the case without trial. They stipulated to reasonable, good faith estimates that, because of the contested PDF increases, grant awards to the professional students rose by one-third of the fee increases in 2002–2003 and 2003–2004, and by one-quarter in 2004–2005 and 2005–2006. They also stipulated to reasonable, good faith estimates that grant awards for spring 2003 and summer 2003 students rose by approximately 40 percent and one-third, respectively, of the educational fee increases. In February 2006, the parties filed stipulated calculations of the contested fee increases charged to each subclass, the increases in gift aid resulting from the increases, and the appropriate prejudgment interest.

*Court's Statement of Decision*

On March 2, 2006, the trial court issued its statement of decision granting respondents' motion for summary judgment. The court stated that, in its earlier summary judgment ruling, it found that enforceable contracts existed between each of the three subclasses of students and the University and that the University breached those contracts by increasing the educational fees and the PDF.

With regard to the Regents' argument that it had warned students that fees could be changed and therefore the PDF could be increased, the court found

that the disclaimer was "irreconcilable" with its promises not to raise the PDF. The court ruled that the more specific or exact term was more likely to express the intent of the parties. It therefore concluded that the more specific promise not to increase the PDF for the duration of a student's enrollment was an exception to the general disclaimer that it may raise fees. The court explained: "There is an enforceable contract between the Professional Student Subclass and the University. That contract incorporated the University's clear and unambiguous statements that it would not increase the students' professional degree fee throughout their enrollment. The specific promise not to raise the professional degree fee is an exception to, and takes precedence over, general disclaimers that prices were subject to change. The students performed the contract by enrolling and by paying the professional degree fee for previous terms. The University breached the contract by unilaterally increasing the professional degree fee for the spring 2003 term and for subsequent years."

With respect to the 2003 spring and summer student subclasses, the court found that the contract term at issue was the price for a specific semester or term. It stated that the University's publications containing price information regarding upcoming semesters or terms were advertisements or invitations to enter a contract. When students enrolled in the classes, they made offers to purchase. The court determined that the University accepted the students' offers when it sent them bills. The court stated that the University's position that it could raise the fees by any amount at any time would put "students at the complete mercy of the University" and was unconscionable as was held in *Gamble v. University of New Hampshire* (1992) 136 N.H. 9, 14 [610 A.2d 357, 361] (*Gamble*). The court decided that, once the University billed or assessed students a certain price for the spring and summer 2003 terms and, in many cases, accepted payment from them, the University could not unilaterally demand a higher price without providing new consideration.

With respect to damages, the court noted that the parties had stipulated to the amount of the increased fees charged to each subclass. Pursuant to the stipulation, the professional student subclass was damaged by $34,287,787; the spring 2003 student subclass was damaged by $3,972,645; and the summer 2003 student subclass was damaged by $2,712,681.

The University sought to reduce these amounts by the amount of grant money received by the students. The trial court partially rejected this argument, because it concluded that the students could have used their grant money for living expenses or other costs if they had not been compelled to use this money for fees. The court, however, acknowledged that there was some increase in grant money as a result of the increase in the fees. The parties stipulated that grant awards to the professional student subclass

increased in an amount equal to approximately one-third of the contested PDF's during the 2002–2003 and 2003–2004 academic years, and one-quarter of the contested PDF's during the 2004–2005 and 2005–2006 academic years. The parties further stipulated that grant awards to the subclasses of the spring and summer 2003 students increased in amounts equal to approximately 40 percent of the contested educational fee increases in spring 2003 and one-third of the contested educational fee increases in summer 2003. The court found that the students would not have received these grant amounts in the absence of the fee increases, and it therefore reduced the students' total damages by these amounts.

Accordingly, the court awarded the professional student subclass $23,901,219 ($34,287,787 less $10,386,568), plus prejudgment interest. It gave the spring 2003 student subclass the amount of $2,383,587 ($3,972,645 less $1,589,058), plus prejudgment interest. The summer 2003 student subclass received $1,808,454 ($2,712,681 less $904,227), plus prejudgment interest.

The court concluded that about 1,000 members of the professional student subclass had not yet graduated and it permanently enjoined the University from charging members of the professional student subclass any PDF greater than the amount charged when these students first enrolled in their professional degree program.

The Regents filed a timely notice of appeal.[7]

## DISCUSSION

### I. *Standard of Review for the Granting of Summary Judgment*

The court properly grants summary judgment if the record establishes no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "[T]he

---

[7] The American Medical Association and the California Medical Association requested and received permission to file an amici curiae brief in support of respondents. The amici curiae brief was filed on April 30, 2007, and the University filed an answer on June 4, 2007. On June 19, 2007, respondents filed a motion to strike the University's answer because they alleged the University relied on and cited evidence outside the record. On June 26, 2007, the University filed its opposition to respondents' motion to strike its answer to the amici curiae brief. We consider no evidence outside the record before the trial court. To the extent any of the arguments in the amici curiae brief or the answer to this brief are relevant to the issues on this appeal, we have considered them.

We also grant respondents' request for judicial notice of the Regents' minutes of a meeting on January 21, 1994, and an excerpt of the bylaws of the Regents.

party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Although the burden of production shifts, the moving party always bears the burden of persuasion. (*Id.* at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*) We review the record de novo. (*Id.* at p. 860.)

## II.  *The PDF*

The University's Web site contains a statement that fees can be changed without notice. Links follow this disclaimer, including a link for the fee for "[s]elected Professional School Students." At the Web page for this link, the University declared that increases in the PDF would apply only to new students and that the PDF would remain "the same for each student for the duration of his or her enrollment in the professional degree program." Various catalogues, including the catalogue for Boalt law students, included the statement that the PDF would remain at the same level while the student was enrolled in the program. The catalogues also cautioned that fees and policies could be changed.

It is undisputed that the Regents increased the PDF for the professional student subclass beyond the amount these students paid when they entered the professional program. Thus, the questions presented by this appeal are whether the University and this subclass of students have a contractual relationship and, if so, what are the terms governing that relationship.

A.  *The Relationship of the Students and the University*

1.  *Contract Theory*

The court in *Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 10 [101 Cal.Rptr. 499] (*Zumbrun*) held that the basic legal relationship between a student and a private university is contractual in

nature.[8] Although *Zumbrun* concerned a private university, other courts have recognized that a contractual relationship applies equally to state universities. (See, e.g., *Andersen v. Regents of University of California* (1972) 22 Cal.App.3d 763, 769 [99 Cal.Rptr. 531].) Indeed, " '[t]here seems to be almost no dissent from the proposition that the relationship' " " 'between a public post-secondary educational institution and a student' " " 'is contractual in nature.' " (*Wickstrom v. North Idaho College* (1986) 111 Idaho 450, 452 [725 P.2d 155, 157] (*Wickstrom*).)

" '[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created . . . .' " (*Andersen v. Regents of University of California, supra,* 22 Cal.App.3d at p. 769; see also *Searle v. Regents of University of California, supra,* 23 Cal.App.3d at p. 452 ["students have certain contractual rights"].) When a student is attending a publicly financed institution of higher education, as in the present case, attendance is regarded as a benefit somewhat analogous to that of public employment. (*Andersen, supra,* at p. 770, citing *Goldberg v. Regents of the University of California* (1967) 248 Cal.App.2d 867, 877 [57 Cal.Rptr. 463].)

Although courts have characterized the relationship between the student and educational institution as contractual, they have recognized that contract law should not be strictly applied.[9] " 'The student-university relationship is unique, and it should not be and can not be stuffed into one doctrinal category. . . .' " (*Lyons v. Salve Regina College* (1st Cir. 1977) 565 F.2d 200, 202.) Universities are entitled to some leeway in modifying their programs from time to time to exercise their educational responsibility properly. (*Mahavongsanan v. Hall* (5th Cir. 1976) 529 F.2d 448, 450.) Additionally, courts have often deferred to any challenge based in contract to universities'

---

[8] When citing authority in support of this point, the *Zumbrun* court relied on cases involving both private and public universities. The following cases were cited in *Zumbrun*: "*Carr* v. *St. John's University, New York* (1962) 17 App.Div.2d 632, 633 [231 N.Y.S.2d 410, 413], [affirmed in] 12 N.Y.2d 802 [235 N.Y.S.2d 834, 187 N.E.2d 18]; *Anthony* v. *Syracuse University* (1928) 224 App.Div. 487, 489–490 [231 N.Y.S. 435, 438–439]; *Goldstein* v. *New York University* (1902) 76 App.Div. 80, 82–83 [78 N.Y.S. 739, 740, 12 N.Y. Ann. Cas. 128]; *People* ex rel. *Cecil* v. *Bellevue Hospital Medical College* (1891) 60 Hun 107 [14 N.Y.S. 490], [affirmed in] 128 N.Y. 621 [28 N.E. 253]; *John B. Stetson University* v. *Hunt* (1925) 88 Fla. 510, 517 [102 So. 637, 640]; *University of Miami* v. *Militana* (Fla.App. 1966) 184 So.2d 701, 703–704; *Barker* v. *Trustees of Bryn Mawr College* (1923) 278 Pa. 121, 122 [122 A. 220, 221]; *Greene* v. *Howard University* (D.C. Dist. Col. 1967) 271 F. Supp. 609, 613; see *Dixon* v. *Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, 157, [certiorari denied] 368 U.S. 930 [7 L.Ed.2d 193, 82 S.Ct. 368]; *Searle* v. *Regents of the University of California* (1972) 23 Cal.App.3d 448, 452 [100 Cal.Rptr. 194]." (*Zumbrun, supra,* 25 Cal.App.3d at p. 10.)

[9] There are very few California cases addressing the relationship between the student and educational institutions, and we find the cases from other jurisdictions instructive.

academic and disciplinary decisions. (See, e.g., *Ross v. Creighton University* (7th Cir. 1992) 957 F.2d 410, 414–415 *(Ross)*.)

The University insists that the lower court failed to apply this rule of "flexibility" when applying contract law to the present situation. We agree with the University that it is well settled that contract law is not always rigidly applied, especially in actions challenging the academic decision of a university or a student's qualifications for a degree. (See, e.g., *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551 [42 Cal.Rptr.2d 110]; see also *Ross, supra*, 957 F.2d at p. 416 [" '[c]ourts are not qualified to pass an opinion as to the attainments of a student . . . and . . . courts will not review a decision of the school authorities relating to academic qualifications of the students' "].) "There is a widely accepted rule of judicial nonintervention into the academic affairs of schools." *(Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803, 808 [159 Cal.Rptr. 858, 602 P.2d 778] *(Paulsen)*.)

Our Supreme Court in *Paulsen* applied contract law, although it noted that contract was not always the most apt description of the relationship between the student and educational institution. *(Paulsen, supra*, 25 Cal.3d at p. 811.) The court denied a student's breach of contract claim based on the law school's refusal to provide him a degree. *(Ibid.)* The court explained: "[A]fter [the student's] academic disqualification [the law school] agreed to allow him to enroll in additional courses only on the express condition that he would *not* be eligible for a degree. Any contract between the parties would therefore have included that condition, and by its terms would have precluded awarding Paulsen a degree under any circumstances." *(Ibid.)* Although the court applied contract law, in dicta it noted its doubts that the parties viewed their relationship as contractual. *(Paulsen, supra*, 25 Cal.3d at p. 811, fn. 7, citing Note, *Developments in the Law: Academic Freedom* (1968) 81 Harv. L.Rev. 1045, 1147 ["Although the framing of the student-university relationship in contractual terms may provide a potential source for some student curricular and extracurricular rights, it incorrectly portrays the manner in which the parties themselves view the relationship"].)

The University maintains that no case rejects "the rule of flexibility in a fee case, or states that it applies only to academic matters." It further asserts that the lower court's reliance on the "specific promise" exception as set forth in *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44 [67 Cal.Rptr.2d 850] is, according to the University, "illusory." It is unclear what the University means by "illusory," but we do agree that *Shaw*, which concerns the interpretation of a faculty member's patent contract and the incorporation of the patent policy, is not particularly helpful when considering the type of contractual relationship between a student and a university.

■ The University, however, ignores the types of cases that have applied the rule of flexibility to the relationship of the student and educational institution. Courts have applied contract law flexibly to actions involving academic and disciplinary decisions by educational institutions because of the lack of a satisfactory standard of care by which to evaluate these decisions. (See, e.g., *Ross, supra,* 957 F.2d at p. 414; see also *Paulsen, supra,* 25 Cal.3d at p. 808.) Courts also have been reluctant to apply contract law to general promises or expectations. (See, e.g., *Basch v. George Washington University* (D.C. 1977) 370 A.2d 1364, 1366–1367.) Courts have, however, not been hesitant to apply contract law when the educational institution makes a specific promise to provide an educational service, such as a failure to offer any classes or a failure to deliver a promised number of hours of instruction. (See, e.g., *Ross, supra,* at pp. 415–417; see also *Steinberg v. Chicago Medical School* (1977) 69 Ill.2d 320 [13 Ill.Dec. 699, 371 N.E.2d 634] [contract law applies to agreement that medical school application would be evaluated according to the criteria described by the medical school in its literature]; *DeMarco v. University of Health Sciences* (1976) 40 Ill.App.3d 474 [352 N.E.2d 356] [refusal to award M.D. degree for reasons unrelated to academic qualifications constitutes breach of contract]; *Cencor, Inc. v. Tolman* (Colo. 1994) 868 P.2d 396 [breach of contract action could be maintained against vocational school where there were allegations that school had made *specific* promises, such as promises to provide modern, functioning equipment, computer training, and qualified instructors, and did not do so]; *Reynolds v. Sterling College, Inc.* (2000) 170 Vt. 620, 621 [750 A.2d 1020, 1022] [contract formed when students paid enrollment fee and signed registration statement and one of the terms of the agreement was the catalogue statement about the effective refund policy].) Courts have uniformly held that a contract between an educational institution and a student "confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced."[10] (*DeMarco, supra,* at pp. 361–362.) A breach of contract action regarding a *specific* promise about the fee to be charged is similar to a breach of contract action based on the failure to provide a specifically promised educational service.

The present action does not involve what is essentially an educational malpractice claim or a decision that involves disciplinary discretion. Moreover, it does not involve a general statement or expectation regarding the PDF. "Ruling on this [fee dispute] would not require an inquiry into the nuances of educational processes and theories, but rather an objective assessment" (*Ross, supra,* 957 F.2d at p. 417) of the University's performance of its

---

[10] This quoted statement actually refers to contracts between private institutions and students, but other courts have applied contract analysis to public institutions. (See, e.g., *Andersen v. Regents of University of California, supra,* 22 Cal.App.3d at p. 769.)

promise. Accordingly, we conclude that contract law applies to the students' claims regarding the increased fees.

### 2. *Express or Implied-in-fact Contract*

Respondents argue that the promise not to raise the PDF is an implied term of the students' express contract with the University. The Regents counter that any promise regarding the PDF was part of an implied-in-fact contract, like those between employers and employees, not a term of an express contract. (See *Pacella v. Tufts University School of Dental Med.* (D.Mass. 1999) 66 F.Supp.2d 234, 241; *Zellman v. Ind. School Dist. No. 2758* (Minn.Ct.App. 1999) 594 N.W.2d 216, 219; *Mittra v. University of Medicine* (App.Div. 1988) 316 N.J. Super. 83 [719 A.2d 693, 696–698].) Unilaterally promulgated written guidelines, according to the Regents, constitute an express contract only if "the parties expressly agreed that [the] guidelines governed [their relationship]." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 675, fn. 20 [254 Cal.Rptr. 211, 765 P.2d 373]; see also *id.* at pp. 677–682 (*Foley*).)

Respondents object to analogizing contracts between students and the University to those between employers and employees, because private employment is presumed to be at will and public employment is governed by statute. Thus, there is a presumption that the employer and employee relationship is not contractual. (*Foley, supra,* 47 Cal.3d at p. 676.) No such presumption exists in the context of the student and educational institution.

We need not determine whether the contracts between the University and the students are analogous to employment contracts. There were no formal agreements between the students and the University and, therefore, their agreements were implied-in-fact contracts. Respondents have not pointed to any express promise between the University and the professional student subclass that the University intended the terms in the catalogues or on the Web site to be binding. The terms of an express contract "are stated in words" (Civ. Code, § 1620), while the terms and the existence of an implied contract "are manifested by conduct" (*id.,* § 1621).

In urging us to conclude that there was an express rather than an implied contract, respondents cite to the pronouncement in *Zumbrun* that "catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract." (*Zumbrun, supra,* 25 Cal.App.3d at p. 10.) In *Zumbrun,* the court held that a student who had paid tuition for a course had a cause of action for breach of contract after the instructor failed to deliver the anticipated number of lectures announced in the university catalogue. (*Ibid.*) The court expressed no opinion as to the merit of the

plaintiff's claim, but held that the pleading could be amended to state a breach of contract claim. (*Ibid.*)

Similarly, here, respondents contend that the University breached its express promise on its Web sites and in its catalogues not to increase the PDF for continuing students. The promise not to raise the PDF for continuing students was clear and explicit. Consequently, respondents maintain that the University breached this provision when raising the PDF for continuing students.

The court in *Zumbrun* broadly stated that the catalogues become part of the contract between the student and the institution of higher learning.[11] However, federal courts have almost uniformly held that, in the absence of any formal agreement between the student and the college, the terms of the contract are implied. (See, e.g., *Ross, supra*, 957 F.2d at p. 417; *Lyons v. Salve Regina College, supra*, 565 F.2d at p. 202 [terms of contract between student and college may include statements provided in student manuals and registration materials]; *Mangla v. Brown University* (1st Cir. 1998) 135 F.3d 80, 83 [standard for interpreting contractual terms is that of " 'reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it' "]; *Johnson v. Schmitz* (D.Conn 2000) 119 F.Supp.2d 90, 93 ["Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises . . . appears sound"].) Similarly, state courts in other jurisdictions have concluded that, " '[s]ince a formal contract is rarely prepared [between the student and the institution of higher learning], the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication.' " (*Wickstrom, supra*, 725 P.2d at p. 157.)

■ To the extent that *Zumbrun* stands for the principle that all of the statements in the catalogues are binding on the institution of higher learning, we disagree. If the catalogue or the Web site of the university does not

---

[11] When making this broad statement that catalogues become part of the contract, the *Zumbrun* court cited to a number of state and federal cases. (*Zumbrun, supra*, 25 Cal.App.3d at p. 10.) Many of these cited cases hold that the student and the university have an implied-in-fact contract. (See, e.g., *Carr v. St. John's University, New York, supra*, 17 A.D.2d at p. 633 ["When a student is duly admitted by a private university, secular or religious, there is an implied contract between the student and the university that, if he complies with the terms prescribed by the university, he will obtain the degree which he sought"].)

expressly state that it intends to be bound by these statements, such statements become part of the enrollment agreement only if they are implied-in-fact contract provisions. (See *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 463 [46 Cal.Rptr.2d 427, 904 P.2d 834] [defining implied-in-fact contract provisions].) Universities frequently publish numerous catalogues and bulletins, but not all statements in these publications amount to contractual obligations. "Whether a given section of the bulletin [or catalogue] becomes part of the contractual obligations between the students and the university . . . must depend upon general principles of contract construction." (*Basch v. George Washington University, supra*, 370 A.2d at p. 1367.) Thus, the case law recognizes that, like all obligations imposed pursuant to implied contractual terms, the contractual obligations imposed by the language in catalogues "center around what is reasonable." (*Ruegsegger v. The Board of Regents of Western New Mexico University* (2006) 2007 NMCA 030 [141 N.M. 306, 154 P.3d 681]; see also *Peretti v. State of Mont.* (D.Mont. 1979) 464 F.Supp. 784, 786, revd. on other grounds in *State of Mont. v. Peretti* (9th Cir. 1981) 661 F.2d 756.)

Respondents contend that the term at issue here—the promise not to raise the PDF for continuing students—is an express term. It is true that this was an articulated promise, but it is not part of any express or formal agreement. The existence of a contract between the students and the University is implied in fact, and the question whether the parties' conduct creates such an implied agreement is generally " 'a question of fact.' " (*Scott v. Pacific Gas & Electric Co., supra*, 11 Cal.4th at p. 463.) Since the existence of the contract is implied in fact, the provisions of this contract are also implied in fact. "Implied contractual terms 'ordinarily stand on equal footing with express terms.' " (*Ibid.*)

We conclude that no formal contract exists between the University and the professional student subclass, but that an implied contract was created by the students' conduct when they accepted the University's offer of enrollment. We therefore must determine whether the statements on the University's Web site and in its catalogues not to raise the PDF for continuing students became a term of their implied-in-fact contracts.

3. *The University's Unique Status*

University contends that different rules of contract apply in the present situation because it is a statewide administrative agency with constitutionally derived powers. (Cal. Const., art. IX, § 9, subd. (a).) Since its policies are for some purposes treated like statutes (*Goldberg v. Regents of the University of California, supra*, 248 Cal.App.2d at pp. 876–877), the University claims that it can revise or repeal them at any time. It maintains that its policies can only

become binding terms of an implied-in-fact contract with students, and thus not modifiable, if they satisfy the test that determines when a statute constitutes an offer to form a unilateral contract, such that private parties' acceptance by performance will bind the state.

Respondents point out that the University's unique status based on its constitutionally derived powers has been raised for the first time on appeal and the University never argued this issue in the lower court. Respondents assert that, had this issue been presented below, they would have conducted discovery to determine whether the University had ever attempted to enforce a claim against a student for unpaid or underpaid PDF charges under contract law. Further, respondents present various reasons for rejecting the University's contention that contract theory does not apply because of the University's unique status.

" '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived. [Citations.]' " (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [1 Cal.Rptr.3d 90], fns. omitted.) "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. [Citation.] In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack. [Citation.] Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178 [8 Cal.Rptr.3d 840].)

The lower court never had an opportunity to address the question of the University's unique status because of its constitutionally derived powers and, therefore, the University has waived raising this issue on appeal. Moreover, the University's argument presumes that its duties and obligations at issue in this case arose from the University's policy, since it is its own policy that the University argues should be treated like a statute. However, it was not the University's policy that created its contractual obligations in the present case. The University's policy may have been incorporated as a term of the contract, but the contract itself was formed when the student accepted the University's offer of admission. As already emphasized, the rights and duties of the parties in the present case arose out of an implied contract—not out of the University's policies or from a statute. Courts have consistently applied

contractual analysis when analyzing implied-in-fact agreements between students and colleges, even when the institution of higher education is a public college or university. (See, e.g., *Andersen v. Regents of University of California, supra,* 22 Cal.App.3d at p. 769; *Wickstrom, supra,* 725 P.2d at p. 157.) Once the University admitted the student, the terms of this implied-in-fact contract are analyzed no differently than those arising between private parties. "All contracts, whether public or private, are to be interpreted by the same rules . . . ." (Civ. Code, § 1635.)

B.  *Determining Whether the Promise Regarding the PDF Was a Term of the Implied-in-fact Contract*

■  The University emphasizes that courts in various jurisdictions have uniformly held that colleges can reserve the right to increase tuition. (See, e.g., *Basch v. George Washington University, supra,* 370 A.2d at pp. 1366–1367; *Prusack v. State of New York* (App.Div. 1986) 117 A.D.2d 729, 730 [498 N.Y.S.2d 455, 456–457].) We agree that educational institutions retain the right to raise the fees when that is specified in their catalogues or other publications as long as the increase is reasonable and does not violate any duty of good faith and fair dealing. (See, e.g., *Powell v. Central Cal. Fed. Sav. & Loan Assn.* (1976) 59 Cal.App.3d 540, 549 [130 Cal.Rptr. 635] ["contracting party's discretionary power to vary the price or other performance does not render the agreement illusory if the party's *actual* exercise of that power is reasonable"].)

The question presented here, however, is not whether the University can retain the right to increase the fees. The pivotal question is whether the statements in the catalogues and on the University's Web site not to raise the PDF for continuing students became a term of the implied-in-fact contract between the professional student subclass and the University. As discussed above, we use the standard rules of contract law to determine whether the University's statements regarding the PDF created a contractual obligation.

1.  *Reasonable Expectation*

■  In interpreting the contract, we must "give effect to the mutual intention of the parties as it existed" at the time the contract was executed. (Civ. Code, § 1636.) Where contract language is clear and explicit and does not lead to absurd results, we normally determine intent from the written terms alone. (*Id.,* §§ 1638, 1639.) Those terms are to be understood in their ordinary and popular sense, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage. (*Id.,* § 1644.) "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (*Id.,* § 1649.)

Thus, we look to the reasonable expectation of the parties at the time of contract. To determine the reasonable expectation of the parties we examine "the totality of the circumstances . . . . Agreement may be ' "shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances." ' " (*Foley, supra*, 47 Cal.3d at p. 681.) Cases involving contractual obligations of colleges based on language in catalogues or handbooks focus on what is reasonable. (*Peretti v. State of Mont., supra*, 464 F.Supp. at p. 787.)

The reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue. (See, e.g., *Sanchez v. The New Mexican* (1987) 106 N.M. 76, 79 [738 P.2d 1321, 1324] [affirming the dismissal of an implied contract claim on grounds that "the handbook lacked specific contractual terms which might evidence the intent to form a contract . . . [insofar as the] language is of a non-promissory nature and merely a declaration of defendant's general approach"].)

The University maintains that the comment regarding the PDF is simply one statement among thousands in the catalogues and on the Web sites and the PDF comment cannot be a term of the contract, especially when the publications contain a reservation of right to change the fees. As already noted, courts have not interpreted general and vague declarations or promises in university publications as creating contractual obligations. Thus, for example, in *Basch v. George Washington University, supra*, 370 A.2d 1364, a case frequently cited by the University, the promise regarding tuition in the bulletin was too general to create a contractual obligation. In *Basch*, prior to the students' acceptance into medical school, they received a bulletin that set forth tuition costs. (*Id.* at p. 1365.) Although the exact language in the bulletin varied from year to year, the bulletins contained essentially the same language regarding tuition. (*Ibid.*) The 1974–1975 bulletin specifically set the tuition rate for the 1974–1975 academic year at $3,200, but the following statement immediately followed: " 'Academic year tuition increases have been estimated as follows: 1975–76, $200; 1976–77, $200; 1977–78, $200; 1978–79, $200. . . . Every effort will be made to keep tuition increases within these limits. However, it is not possible to project future economic data with certainty, and circumstances may require an adjustment in this estimate.' " (*Ibid.*) The *Basch* court rejected the students' claim that they had a contract with the university regarding tuition increases beyond the 1974–1975 academic year. (*Id.* at pp. 1365–1366.) The appellate court explained that words such as " 'estimated,' " found in the tuition paragraph in the bulletin were too indefinite to create a contractual obligation. (*Id.* at p. 1367.) The court decided: "At best, these words expressed an expectancy by the [educational institution] regarding future increases. This is not a promise susceptible of enforcement." (*Id.* at p. 1368.)

In the present case, the University's statement promising not to raise the PDF is not qualified by any language suggesting that this was merely an expectation. The promise regarding the PDF is not a general statement or declaration in the catalogue. Rather, it is a specific promise. The promise is that increases to the PDF "apply to new students only. The Fee will remain the same for each student for the duration of his or her enrollment in the professional degree program."

Since the language regarding the PDF in the catalogues and on the Web site is unequivocal, the reasonable expectation of the parties would be that once the student enrolls in the University and the University accepts his or her payment of the PDF, the PDF will remain the same for the duration of the student's enrollment in that program. It is reasonable that an institution of higher education would promise not to increase the PDF for continuing students in exchange for the student's promise to attend that institution.

Accordingly, we conclude that it was reasonable for students to believe that the general statement that fees could be changed did not apply to the PDF, which, according to the statements set forth by the University, would remain the same for the duration of that student's enrollment in the professional program.

2. *University's Contentions*

   a. *Specific Versus General Provision*

It is undisputed that on its Web site and in its various publications the University provided the students with the general warning that fees can be changed without notice. The lower court found that the specific provision referring to the PDF and promising not to raise the PDF for continuing students trumped this general term. The University contends that the general contract rule that a specific provision overrides a general term does not apply in this case.

In making the foregoing argument, the University asserts that Code of Civil Procedure section 1859 is inapplicable. Code of Civil Procedure section 1859 provides: "In the construction of a statute the intention of the Legislature, and in the construction of the instrument the intention of the parties, is to be pursued, if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it." (See also Civ. Code, § 1650 ["Particular clauses of a contract are subordinate to its general intent"].)

The Regents argue that no case applies section 1859 of the Code of Civil Procedure to an implied-in-fact contract. Since the contract is created by

conduct, not a written instrument, the University asserts that Code of Civil Procedure section 1859 has no applicability.

■ Although the students and the University have an implied-in-fact contract, some of the terms of the agreement are set forth in a written instrument and section 1859 of the Code of Civil Procedure applies to these written statements. Under well-established principles of contract interpretation, when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision. (See, e.g., *National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 386 [131 Cal.Rptr. 42, 551 P.2d 362].) Moreover, we are to interpret the written provisions regarding fees together, "so as to give effect to every part . . . ." (Civ. Code, § 1641.) Under the interpretation urged by the University, the specific promise not to raise the PDF for continuing students would have no meaning.

The Regents assert that the general fees statement can be reconciled with the PDF statement by interpreting the PDF as a "*summary* of the Regents' then-current PDF Phase-in-Policy[*sic*]—a policy the Regents had constitutional authority to amend at any time." The Regents further claim that this interpretation allows for an emergency exception, such as the fiscal crisis.

We are unpersuaded by the Regents' contention that the express promise not to raise the PDF was merely a summary of the Regents' intent to phase in increases of the PDF. Indeed, the Boalt catalogue expressly states that the University's intent was not to raise the PDF for continuing students despite the fact that other fees may change. The Boalt catalogue stated: "The [PDF] is one component of the total fees. The [PDF] remains at the same level for the three years in which the student is enrolled in the program. Other components of total fees, however, could change."

■ The University had complete control over what language to use in its catalogues and on its Web sites. It is well established that "[i]n cases of uncertainty not removed by [other] rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654; see also *Goddard v. South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 105 [144 Cal.Rptr. 701].) The University chose to declare that fees could change at any time at the same time it promised that one type of fee, the PDF, would not be raised for continuing students. If the University intended to retain the right to raise the PDF for continuing students, it should have so specified. Consequently, the University cannot now complain that a reasonable interpretation of the specific promise not to raise the PDF for continuing students takes precedence over its general statement that fees can change without notice.

b.  *No Reasonable Expectation Because Public University Depends upon Legislative Funding*

Despite the clear language promising not to raise the PDF for continuing students, the University argues that a continuing student would not have a reasonable expectation that there would be no increase to the PDF while that student remained enrolled in the professional program. The University proposes that the PDF statements were merely phrases in policy, not individual promises to students. It further maintains that professional school graduate students knew that the University is a public institution and its funding is dependent upon the Legislature and Governor. Various catalogues, such as the UC Davis Law School catalogue cautioned: "Tuition and fees are subject to legislative and gubernatorial action—they may change without notice." Further, the University points out that the Web site containing the link to information about the PDF expressly stated: "Fees are subject to change without notice."

The University notes that if it expressly reserved the power to increase fees at any time, that reservation must be part of the implied-in-fact contract with students. The University compares the present case to *Searle v. Regents of University of California, supra,* 23 Cal.App.3d 448, *Abbariao v. Hamline University School of Law* (Minn. 1977) 258 N.W.2d 108, *Gamble, supra,* 610 A.2d 357, 359, and *Eisele v. Ayers* (1978) 63 Ill.App.3d 1039, 1044 [21 Ill.Dec. 86, 381 N.E.2d 21, 26]. In each of these cases the courts upheld the educational institution's right to reserve specific powers.

We are not persuaded that the cases cited by the University compel the result it urges. Courts have consistently refused to interfere with the educational curriculum and selection, retention, and conditions of employment of academic personnel (see, e.g., *Hamilton v. Regents of the Univ. of Calif.* (1934) 219 Cal. 663 [28 P.2d 355]; *Scharf v. Regents of University of California* (1991) 234 Cal.App.3d 1393, 1405 [286 Cal.Rptr. 227]), which is not at issue in the case before us. Consistent with this policy of not judicially interfering with academic personnel decisions, the court in *Searle v. Regents of University of California* refused to force the University to give credit for a course where nonmembers of the faculty gave too many lectures and the Regents had expressly reserved authority to appoint faculty. (*Searle v. Regents of University of California, supra,* 23 Cal.App.3d at p. 452.) The court concluded that the Regents had the authority to determine that nonmembers of the faculty may not conduct courses for credit, and the students were aware of the Regents' denial of credit before beginning the course. (*Ibid.*) Not only does the case before us not involve an academic personnel decision, but the record in the present case does not contain any evidence that students knew the University intended to increase the PDF for continuing students.

*Abbariao v. Hamline University School of Law, supra,* 258 N.W.2d 108 also does not help the University. This case concerns expulsion of a student, an area in which courts grant colleges great discretion. The *Abbariao* court rejected a student's argument that the school breached its contract when it failed to offer him a tutorial seminar after he received failing grades. The court noted that the student was relying on a promise made three years earlier by the school's predecessor, a promise no longer in effect because the school's bulletin stated that its provisions were subject to change without notice, and the student accepted this provision each time he paid his semester tuition. (*Id.* at pp. 113–114.) The court did not reject the student's breach of contract action outright, but concluded only that the school could not be held to a promise made by another institution. (*Ibid.*) In contrast, the only promises made in the present case were made by the Regents, not a third party.

The University's reliance on *Gamble, supra,* 610 A.2d 357, and *Eisele v. Ayers, supra,* 381 N.E.2d 21, is also misplaced. In *Gamble,* the catalogue set forth the cost of attending the university with the *express reservation* that the university may adjust the charges to be assessed. (*Gamble, supra,* at p. 361.) The students were also required to pay their bills by the end of the registration period. (*Ibid.*) The court concluded that once the student paid his or her bill by the end of the registration period, the reservation of rights clause became ineffective. (*Ibid.*) However, in-state students who received letters from the university informing them of an impending increase were "on notice that there was an excellent chance that the tuition would be raised" and the reservation of rights clause remained effective. (*Id.* at pp. 361–362.) Thus, the court in *Gamble* applied contract law to interpret the duties and obligations of each party. Further, there was no promise in *Gamble,* as in the present case, not to raise the fees for a period of time for continuing students. In *Eisele,* the court held that fees not raised maliciously or in bad faith could be raised when the relevant catalogues warned that "tuition rates are subject to change 'without notice' " or " 'on short notice.' " (*Eisele v. Ayers, supra,* at p. 26.) In contrast to the present situation involving the University, in *Eisele* the college had not promised in the catalogues not to raise a particular fee for a specified time.

The University also asserts that it would have been unreasonable for a student to expect the University to be restricted from raising the PDF because the University expressly reserved the right to increase all other fees. The University speculates that a student would not care about the specific amount of the PDF and would have no reasonable expectation that it would remain constant because the student is only concerned with the total fee charged. This argument makes little sense and there is nothing in the record to suggest that any student disregarded the promise not to raise the PDF.

As the Boalt catalogue expressly stated, fees other than the PDF could be changed. Given the University's explicit promise not to raise the PDF for continuing students, it was reasonable for students to believe that the PDF was an exception to the general term that the University could change the fees at any time. This case differs significantly from the cases cited by the University in the respect that the University provided a specific promise not to raise the PDF for continuing students. The University did not advise the students that this promise was conditional on there not being a state budget shortfall or any other exigent circumstance. Accordingly, the fact that the University depended upon legislative funding did not alter the students' reasonable expectation that the PDF would not be raised for continuing students. Indeed, the students could reasonably expect that any immediate fiscal problems could be alleviated by raising the PDF for new students or raising other fees.

## C.  *Increasing the PDF to Meet Fiscal Needs*

The University contends that even if the promise not to raise the PDF for continuing students is a term of its contractual relationship with the students, that term applied only to increases related to the phase-in-policy. It maintains that its promise not to raise the PDF did not pertain to any increase caused by the need to meet fiscal needs.

To support this contention, the University points to its phase-in policy, which established that the PDF, unlike other fees, was designed to make professional students pay a more equitable share of the cost of their education, as measured by the fees charged by comparable schools. The University chose to phase in the increase in its quest to achieve the goal of parity with comparable institutions across the nation.

The increases to the PDF in 2002, the University maintains, was not for the purpose of achieving parity, but for the purpose of dealing with the state's fiscal problems. It notes that contracts are not interpreted in a vacuum and the meaning must be considered in light of the subject matter and the purposes of the parties. (Civ. Code, § 1647; see also *Eastman Oil etc. Corp. v. Lane-Wells Co.* (1943) 21 Cal.2d 872, 873 [136 P.2d 564].) The University concludes that its promise not to raise the PDF related only to any raise related to achieving parity and a raise due to the fiscal crisis did not violate its promise not to raise the PDF for continuing students.

This argument by the University merits little discussion.[12] The promise made to the students on its Web site and in its catalogues was not limited in the manner now being advanced by the University. The circumstances surrounding and leading to the execution of a contract may be considered to ascertain its true meaning (Civ. Code, § 1647; *Du Frene v. Kaiser Steel Corp.* (1964) 231 Cal.App.2d 452, 457 [41 Cal.Rptr. 834]), "but these circumstances cannot be considered for the purpose of creating undertakings contrary to the specific terms of the writing" (*Du Frene, supra,* at p. 457). In the present case, the clear language on the University's Web site and in its catalogues was a broad promise not to raise the PDF for continuing students. There is absolutely nothing in the record to support an argument that the students believed the PDF could not be increased to achieve parity but could be increased to meet fiscal problems.

■ Although the intent of the parties determines the meaning of the contract, the relevant intent is the objective intent as evidenced by the words used by the parties and not either party's subjective intent. (*Shaw v. Regents of University of California, supra,* 58 Cal.App.4th at pp. 54–55.) Nothing in the promise regarding the PDF hints at what the University now claims was its intent to limit this promise only to increases related to achieving parity. The University cannot now attempt to rewrite its promise not to raise the PDF for continuing students in a manner that is contrary to the clear language of its statements made on its Web site and in its catalogues.

Finally, to the extent the University is arguing that the fiscal crisis excused its performance on the promise not to raise the PDF, we reject this contention. The University argues that even *Zumbrun, supra,* 25 Cal.App.3d 1, establishes that courts interpret seemingly absolute promises to be limited by the governmental power that reasonable students would expect a university to reserve. Although the *Zumbrun* court held that the student had alleged a breach of contract claim when the professor's protest resulted in canceling a number of classes, the court noted in a footnote that its decision did not "foreclose the right of university administrators or faculty members to take appropriate action, including the suspension or cancellation of classes, when

---

[12] The University does not point to any place in the record where it made this argument in the lower court. Since determining the circumstances surrounding the contract is, in part, a factual matter, the University has waived raising this issue on appeal.

In its petition for rehearing the University claims that it did make this argument in the lower court and it points to the pages in the record where this argument was raised. We note, however, that the University did not cite to these pages in the record when arguing this issue in its opening brief before this court. The University also never addressed in its reply brief respondents' argument that it had waived this issue because it had failed to raise it below. We cannot be expected to comb through more than 1550 pages in the record to determine whether the University did in fact raise this argument. By failing to address respondents' argument of waiver, the University forfeited this issue. In any event, as discussed above, this issue fails on its merits.

faced with demonstrations or threats of demonstrations on campus . . . which present actual danger to lives or property." (*Id.* at pp. 10–11, fn. 4.)

██  Even if we were to agree that *Zumbrun* allows for an emergency exception to an absolute promise by the educational institution, the University has failed to establish an emergency exception amounting to impossibility of performance in the present case. Although the University likens its fiscal crisis to an emergency presenting an "actual danger to lives or property" (*Zumbrun, supra,* 25 Cal.App.3d at pp. 10–11, fn. 4), economic crises do not excuse performance on a contract.[13] "Facts which may make performance more difficult or costly than contemplated when the agreement was executed do not constitute impossibility." (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 154 [135 Cal.Rptr. 802].) Thus, the fiscal problems experienced by the University did not excuse its performance.

## D. *Raising the PDF After 2003*

The University's Web site and catalogues last contained the promise not to raise the PDF for continuing students for the 2002–2003 academic year. Thereafter, the promise no longer appeared on the Web site or in catalogues. The University maintains that each term in which the student enrolls constitutes a new contract. Therefore, according to the University, the PDF statement did not apply to the subsequent academic years, such as the academic year of 2003–2004. Consequently, the University asserts, even if it did breach the students' contract when it increased the PDF in the spring of 2003, the subsequent increases did not constitute a breach of contract claim.

The University is again attempting to eschew the effect of the clear language of its promise on its Web site and in the catalogues. The University's promise was not limited to the academic year of the catalogue. Rather, the express language of the promise stated that continuing students would not have to pay an increased PDF for the duration of their enrollment in the professional program. As with any contract, the parties' explicit terms and intentions control. (See, e.g., *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

---

[13] We note that there is no evidence that the University was faced with possibly closing its doors to students as a result of the fiscal crisis, which could possibly constitute an "emergency" exception.

■ The contractual relationship between students and educational institutions can encompass promises that expire at the end of the term and other promises that extend throughout the student's enrollment in the program. When an institution of higher learning makes a promise that extends for the entire length of a student's enrollment in the institution or program, courts have not limited the agreement to a single term or semester. In *Niedermeyer v. Curators of State University* (1895) 61 Mo.App. 654, the catalogue for the year in which the plaintiff entered the law school provided that the fee was $50 for the first year's attendance and $40 for each successive year. (*Id.* at p. 657.) The plaintiff paid the $50 for the first year, but his tender of $40 tuition for the next year was rejected with the explanation that the tuition was now $50 per year, as set forth in the new catalogue. (*Ibid.*) The *Niedermeyer* court concluded that once a student accepted a proposition contained in an earlier catalogue, the rights of the student became fixed. (*Id.* at p. 662.) It then "was not within the power of the [law school] to alter or abridge those rights by withdrawing the proposition and publishing that contained in the [later catalogue]." (*Ibid.*)

More recently in *Ross, supra*, 957 F.2d 410, the court did not limit the college's promise that a student on an athletic scholarship would receive a meaningful education during the entire time he was enrolled at the school to apply to only one school term. When offering the student an athletic scholarship, the college in *Ross* assured him that he "would receive sufficient tutoring so that he 'would receive a meaningful education while at [the college].'" (*Id.* at p. 411.) He attended the college from 1978 until 1982, and he alleged that, during this time, the school failed to provide him with sufficient services, such as tutoring. (*Id.* at p. 412.) The *Ross* court held that he could pursue a breach of contract claim for the school's failure to provide him services and for denying him a meaningful education for the years he attended the college. (*Id.* at p. 416.)

The University's argument that the students' contract is limited to one academic term relies on *Eisele v. Ayers, supra*, 381 N.E.2d 21, *Abbariao v. Hamline University School of Law, supra*, 258 N.W.2d 108, and *Aase v. State, South Dakota Bd. of Regents* (S.D. 1987) 400 N.W.2d 269, 270 (no breach of contract claim when university closed particular campus because contract between student and college is for the term for which the tuition is paid and students could complete education at different campus). In *Eisele,* the court rejected the medical students' claim that the fee for their tuition could not be raised as the catalogue specified that tuition and fees were subject to change without notice. (*Eisele v. Ayers, supra*, at p. 26.) The court denied the students' claim that they had a four-year contract for a specified fee with the university once they entered the college. (*Ibid.*) The court explained: "This argument is based upon the premise that both sides entered into a four-year contract when plaintiffs enrolled at Northwestern. Such is not the case. The

contract is renewable on a semester to semester basis. No obligation to pay tuition arises until a student enrolls for courses each semester. Plaintiffs do not suggest that their initial enrollment at Northwestern obligated them to pay tuition for four years, regardless of whether they completed their studies. Thus, at the time the present tuition increase was announced, plaintiffs were under no obligation to pay." (*Id.* at pp. 26–27.)

Similarly, in *Abbariao v. Hamline University School of Law, supra,* 258 N.W.2d 108, the court stated that a new contract was formed each time the plaintiff paid his tuition for that semester. (*Id.* at p. 114.) The court rejected plaintiff's breach of contract claim based on a promise three years earlier with a different law school that a tutorial seminar would be offered when the bulletin noted that " '[a]ll provisions within this bulletin [were] subject to change without notice.' " (*Ibid.*)

None of the cases relied upon by the University included a promise that was to last for the "duration" of the student's enrollment in the school. When the language in the catalogue or other publication does not provide a time period, we agree that the reasonable expectation is that the statements in these publications apply only to the academic year of that year's catalogue. However, here the University expressly stated that it would not raise the PDF for the duration of the student's enrollment in the program and this promise applied to those students entering the year the catalogue was published. Therefore, the promise did not expire at the end of that academic year. (See *University of Tex. Health Sci. Ctr. v. Babb* (Tex.App. 1982) 646 S.W.2d 502, 506 [held that a school's catalogue constituted a written contract between the educational institution and the patron, where entrance was had under its terms and, therefore, the student, upon entering the nursing school under the 1978–1979 catalogue, had a right to complete the degree requirements while enrolled in the program under this catalogue's terms].)

Students at UC presumably made choices about which professional program to attend based on the University's promises about fees. We will not rewrite the promise not to increase the PDF for the duration of the student's enrollment in the program to a promise not to raise it for that academic term.

For all the foregoing reasons, we reject the University's argument that the students did not have a reasonable expectation that the PDF would not be increased for the duration of their enrollment in their professional program.

### III. *The Educational Fee*

The University's Web sites advised students that fees were "subject to change without notice." In November and early December 2002, the University

billed students for the spring term. Subsequently, on December 16, 2002, the Regents increased the fee. Similarly, the Regents increased the summer 2003 fees after the students had received their bills. The bills did not contain any statement that the amount specified on the bill could still change or increase. The lower court ruled that once the University sent the bills to the students and the bill specified an amount, the University could not unilaterally increase the amount of the tuition without consideration. The University maintains that the lower court erred because the University retained the right, as expressly stated on its Web site, to increase the fees without providing any notice.

As discussed above, the relationship between the students and the University is governed primarily by contract principles. In the present case, the catalogues and Web sites advertised a specific price for the educational fee, but they also contained an admonishment that these fees could be increased at any time. However, the question is what does this disclaimer mean in light of the students receiving a bill for the spring and summer terms of 2003 from University, which specified the exact amount charged for that term and the due date for payment.

■■■ Under contract law, the relationship between the students and University is to be interpreted to "protect the reasonable expectations of the parties" (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 475 [47 Cal.Rptr.2d 12]) at the time the contract is formed (Civ. Code, § 1636). Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) "[L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

The interpretation of a contract "must be fair and reasonable, not leading to absurd conclusions." (*Transamerica Ins. Co. v. Sayble* (1987) 193 Cal.App.3d 1562, 1566 [239 Cal.Rptr. 201].) "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.)

"If the contract is capable of more than one reasonable interpretation, it is ambiguous [citations], and it is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties [citation]." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798 [79 Cal.Rptr.2d 273].) "If the terms of a promise are in any respect

ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649.)

The University asserts that there is nothing inconsistent with sending out a bill and reserving the right to change the fee and it cites *Eisele v. Ayers, supra,* 381 N.E.2d 21. The court in *Eisele* stated that it found nothing "ambiguous in the language providing that tuition rates are subject to change 'without notice' or 'on short notice.' " (*Id.* at p. 26.) However, unlike the present case, the students in *Eisele* had not received a bill specifying a certain amount was being charged for the next term. Rather, in *Eisele,* the students' claim was simply that the university should not have an absolute right to increase tuition beyond what was reasonable. (*Id.* at p. 25.)

In the present context, where students have received a bill specifying a particular fee to be paid, the University's disclaimer is ambiguous. The disclaimer can mean that fees can be changed at any time, including after the student has been billed. It can also mean that fees can be changed, but once the University establishes a set fee for a particular term and sends the bill for that term, fees can be changed only for other terms. It could mean that fees can be changed at any time, but the fee is the amount specified in the bill unless the bill indicates that this amount is only an estimate or is likely to increase. Thus, in the present context, we conclude the disclaimer is ambiguous and, therefore, we examine the reasonable expectations of the parties.

Although we are not aware of any California case that has directly addressed the issue presented by this appeal, a case in another jurisdiction has considered a breach of contract claim based on increasing the tuition after the students had received their bills. (*Gamble, supra,* 610 A.2d 357.) In *Gamble,* the university published the cost of attending the college in its catalogue with the express reservation that it could adjust the charges to be assessed. (*Id.* at p. 361.) The catalogue also specified that the student had to pay all outstanding charges prior to the start of the semester. (*Ibid.*) The court concluded "that a reasonable person could interpret the language of these two clauses to mean that all bills must be paid by the end of the registration period, at which time the reservation of rights clause would be rendered ineffective." (*Ibid.*) The court elaborated: "The [u]niversity, by the reservation of rights clause, does not have the right to arbitrarily raise the tuition after the registration time deadline. It is inconceivable that the [u]niversity could retain carte blanche authority to raise the tuition at any time during the semester for any amount it deems appropriate." (*Ibid.*) Thus, the court explained: "It is not sufficient for the [u]niversity to put a general disclaimer in the catalogue that [it] may raise the tuition at any time during the semester. The students must be advised of any impending surcharge in order to be able to make an informed decision as

to whether they can afford the potential increase or whether they prefer not to enroll at the institution for that semester." (*Ibid.*)

In *Gamble,* however, the university had sent individualized letters with the bills to in-state students warning them of an impending increase to their fees. (*Gamble, supra,* 610 A.2d at pp. 361–362.) Since the in-state students received actual notice and were exposed to the extensive media coverage regarding the proposed increase, the *Gamble* court determined that "a reasonable in-state student would have entered into his or her agreement with the [u]niversity knowing that tuition might well be raised in the middle of the semester." (*Id.* at p. 362.) Out-of-state students, however, did not receive individualized notice and the court concluded that it could not presume these students would have been exposed to the local media coverage; therefore, the court concluded that the out-of-state students did have a breach of contract claim against the university. (*Ibid.*)

We agree with the *Gamble* court that students receiving a bill have a reasonable expectation that the sum charged will not change unless the bill is accompanied by an advisement that the sum stated in the bill may still change. The University's statements on its Web site and catalogues alerted students to the fact that posted fees could change without notice. However, it was reasonable for the student to expect that once he or she received an actual bill for a specific amount to be paid by a particular date, and that bill did not indicate there could be any further change, the University had established the actual fee as reflected by the bill.

Further, we are mindful that when uncertainty is not removed by other rules of contract construction, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654; see also *Goddard v. South Bay Union High School Dist., supra,* 79 Cal.App.3d at p. 105.) In the present case, the University issued the general disclaimer that fees could be changed without notice. This disclaimer did not warn that fees could change even after a student receives a bill charging the student a specified amount for a particular term because of possible state budget problems.[14] Additionally, the University could have simply enclosed with the bill a statement that the fee was still subject to

---

[14] Thus, for example, the following statement appeared in catalogues of the University of Mississippi: " 'It is the intent of the [u]niversity to keep at a minimum the necessary expenses of its students. Changes are made in fees to benefit the students whenever possible. Increases are put into effect only when public support funds are inadequate and when no other recourse is available; therefore, the [u]niversity must reserve the right to increase or modify fees and tuition without prior notice, upon approval by the Board of Trustees.' " (*Aronson v. University of Mississippi* (Miss. 2002) 828 So.2d 752, 755–756.)

change,[15] although we express no opinion as to whether this would be susceptible to an unconscionability claim.[16]

If we were to permit the University's disclaimer to permit it to raise the fees at any time without providing the students with any notice, even after students have paid their bills, this would lead to absurd results. We agree with the *Gamble* court that "[i]t is inconceivable that the [u]niversity could retain carte blanche authority to raise the tuition at any time during the semester for any amount it deems appropriate." (*Gamble, supra*, 610 A.2d at p. 361; see

---

[15] The University argues that a statement that the fee may still be increased did not need to accompany the bill because the students were on notice that fees could be raised at any time. Further, the University maintains that it could not provide notice when the bill was sent out because the Governor released the budget plan on December 6, 2002, and the Regents approved the tuition increase on December 16. By then, enrollment for the spring 2003 semester had started. The University may not have known whether it would have to raise tuition or how great the increase would be, but it was aware of the budgetary issues and it could have advised the students that the amount specified in the bill could be changed or was likely to increase due to the budget problems.

[16] Respondents argue that permitting the University to be able to increase the fees at any time is unconscionable. The University responds by pointing out that parties to a contract may agree to modify it. (See, e.g., Civ. Code, § 1698; see also *Busch v. Globe Industries* (1962) 200 Cal.App.2d 315, 320 [19 Cal.Rptr. 441] ["When a modification is in accordance with a provision authorizing and setting forth a method for its revision the rule that a contract in writing may be altered only by another written contract or an executed oral agreement has no application because there is no alteration"]; *Badie v. Bank of America, supra*, 67 Cal.App.4th at pp. 792, 801 [bank could not modify contract to include an arbitration term when the change was not "addressed in any way, shape or form in the original agreement" but the bank could have changed its fees or other fees that were "integral to the financial relationship between the [b]ank and its credit account customers"].)

The University also maintains that its authority to change the fees at any time does not make the agreement illusory. (See, e.g., *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 923 [216 Cal.Rptr. 345, 702 P.2d 503].) The Supreme Court in *Perdue* noted, " '[A]n agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable.' " (*Ibid.*) However, "[i]f there are reciprocal promises . . . the fact that the contract permits one party to set or change the price charged for goods or services does not render the contract illusory." (*Ibid.*) The *Perdue* court cited *Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474 [289 P.2d 785], where the court upheld a contract permitting the buyer of sugar beets to set the price to be paid because the buyer did not have arbitrary power. The court explained, " '[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' " (*Perdue, supra*, at p. 923, citing *Cal. Lettuce Growers, supra*, at p. 484; see also *Powell v. Central Cal. Fed. Sav. & Loan Assn., supra*, 59 Cal.App.3d at p. 549 ["contracting party's discretionary power to vary the price or other performance does not render the agreement illusory if the party's *actual* exercise of that power is reasonable"]; *Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 141 [191 Cal.Rptr. 849] ["[u]nder California law, an open term in a contract must be filled in by the party having discretion within the standard of good faith and fair dealing"].)

We note that even under the holdings of the foregoing cases the University's authority to raise fees is limited by imposing on the University a duty to act reasonably or to act within the standard of good faith and fair dealing.

also *Reynolds v. Sterling College, Inc., supra*, 750 A.2d at pp. 1022–1023 [applied the reasoning in *Gamble* to hold that the contract between the college and students gave the students the right to a tuition refund as provided in the catalogue when the students had not received notice of the change in the tuition refund policy until after they had paid the tuition].)

The University argues that the lower court essentially modified its general disclaimer of being able to change the fees at any time to read that fees could be changed "except that notice must be given before rendition of a bill for, or payment of the fees." The University argues that the lower court erred in finding that the implied term that it could not change the educational fees after sending out the tuition bills prevented it from exercising its express right to change the fees at any time. (See *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 268, 276–278 [235 Cal.Rptr. 279] [contract gave employer right to terminate employee at any time and for any reason and an implied covenant could not impose requirement of good reason].) It contends that an implied covenant cannot impose substantive duties or limits on it beyond the express term that the fees could be changed.[17] (See, e.g., *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349–350 [100 Cal.Rptr.2d 352, 8 P.3d 1089] [covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement"]; but see *Perdue v. Crocker National Bank, supra*, 38 Cal.3d at p. 923 [where contract provides one party with unilateral discretionary power, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing].) We, however, are not rewriting the terms of the agreement, but reconciling two terms that result in ambiguity: a statement that the fees can be changed at any time and a billing statement for the spring or summer 2003 term providing that the charge for that term is a specific sum to be paid by a certain date.

The University also stresses that courts uniformly enforce disclaimers in contracts between students and institutions of higher learning. (See, e.g., *Searle v. Regents of University of California, supra*, 23 Cal.App.3d 448 [Regents' specific reservation of authority to appoint faculty defeated students' claim they were entitled to credit for course given by nonfaculty member]; *Easley v. University of Michigan Bd. of Regents* (E.D.Mich. 1986) 627 F.Supp. 580, 586 [no breach of contract claim based on provision in university bulletin when language in university bulletin states that a term in the bulletin " 'is subject to change at any time,' " and is " 'intended to serve only as a general source of information about the Law School and is in no

---

[17] Respondents maintain that this assertion contradicts the University's argument that the PDF, which was also set forth in the catalogues and on the Web site, was not a term of the contract between the students and the University.

way intended to state contractual terms' "].) We agree that courts enforce disclaimers. However, in the present case, the disclaimer became ambiguous when the University sent out bills specifying a particular charge for the spring or summer 2003 term to be paid by a certain date. Accordingly, we applied well-established principles of contract law to determine the parties' intent.

The University urges that the summer 2003 subclass, in particular, has no claim for breach of contract because it received individualized notices of the fee increase before classes began. These students still could have withdrawn with a full refund. Additionally, the University argues that the spring 2003 students had advance notice of the increase because they received an e-mail notice of the increase before classes began and they, too, could then have withdrawn. The University asserts that all of the students had actual or constructive notice from various sources that the fee increases were likely. Thus, for example, the president's office had posted press releases to that effect starting in November.

The record does not establish that students attending the spring and summer terms in 2003 received any actual notice of any impending increase in the educational fee prior to receiving their bills. It is immaterial whether students received notice of the fee with sufficient time to receive a refund if they chose to withdraw. Most of the students had already paid their bills and it was too late for many of the students to change their plans without incurring various costs. Moreover, the students paid their bills to take classes and receive an education, not to be entitled to a refund. In *Gamble*, the university sent individualized letters to in-state students warning them of an impending increase to their fees and these letters accompanied their bills. (*Gamble, supra*, 610 A.2d at p. 361.) No such letter accompanied the bills in the present case.

The University argues that *Gamble* was decided prior to the widespread use of the Internet, and it is now reasonable to expect that all of the students had access to the Web sites and other information warning of the state's budget problems. As we have already noted, the record provides no evidence that the students read the Web sites or followed other announcements in the media regarding the state's budget problems. Further, the students had no obligation under the contract to monitor the media. We must determine a student's reasonable expectation when the student knows the University can change fees at any time and the student receives a bill for a specified amount to be paid by a particular date in order to enroll for that term.

We conclude that the expectation is that, even though the fee may change for the next term, the fee for that term is the one reflected by the bill. Thus, the student knows that he or she cannot rely on the fee set forth in the

catalogues or on the Web site, because of the admonishment that fees are subject to change. However, once the student is told that he or she can enroll at a particular price and must pay that particular sum by a certain date, the student should reasonably be able to expect that fee has now become firm.

Under the University's analysis, the University could raise the fees by any amount and at any time. This would make it impossible for students to make any plans about their financial obligations. It would also provide the students with insufficient notice to permit them to make other plans. Accordingly, we hold that the University breached its contracts with the students attending the spring and summer terms of 2003 when it raised the educational fees for these terms after the students had received bills for these terms charging them a set fee to be paid by a particular date.

## IV. *Damages*

The trial court awarded respondents damages that equaled the amount of the fee increases offset by the amount of grant aid the students received as a result of the fee increase. The court then added the stipulated prejudgment interest. The court rejected the University's argument that respondents' recovery should be reduced by all of the grant aid awarded, including the amount the students would have received even if the University had not increased the fees. The court found that the University's position would place respondents in a worse position had the University not breached the contracts because it "would under-compensate students who, in the absence of the fee increases, would have already received substantial amounts of grants (who are primarily the less affluent students)."

The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. (Civ. Code, § 3300.) The aim is to put the injured party in as good a position as he or she would have been had performance been rendered as promised. (See, e.g., *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [277 Cal.Rptr. 40].) A person cannot recover "a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides." (Civ. Code, § 3358.) The burden of establishing mitigation rests with the defendant. (See, e.g., *Mass v. Board of Education* (1964) 61 Cal.2d 612, 627 [39 Cal.Rptr. 739, 394 P.2d 579].)

The University has abandoned its challenge made in the trial court that the damages should be reduced by the entire amount of financial aid awarded to the students. On appeal, it urges us to reduce the damages by the amount of financial aid actually provided by the University and it no longer objects to the damages award including financial aid from sources other than the University. The University, however, concedes in a footnote that the "record does not divide pre-existing gift aid into its University and third-party components."

As the University admits in a footnote, the record contains no factual basis to support its new argument. The University advances the proposition that it did not have to provide evidence of the sum to be deducted because it was respondents' burden to establish damages. The University claims that a number of students did not have to pay any increased fee because the University had provided them with financial support and therefore respondents did not establish that these students suffered any damages.

In the court below, respondents met their burden of establishing their claimed measure of damages. They provided evidence of the amount paid by respondents after the increase and the amount of the educational fees set forth by the bills sent to them and the amount paid for the PDF when they entered the program. They claimed their damages were the difference between that paid and that originally promised. The University countered by asserting this amount should be reduced by the total grant money awarded to these students. The court rejected this argument and now, for the first time, the University is arguing that damages should be reduced by the amount of financial aid it provided.

As already noted, the University concedes that the particular amount of financial aid provided by the University is not contained in the record below. It is axiomatic that it is the responsibility of the party appealing to provide an adequate record on appeal. (See, e.g., *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296 [240 Cal.Rptr. 872, 743 P.2d 932] [to overcome presumption on appeal that an appealed judgment or order is presumed correct, the party appealing must provide adequate record demonstrating error]; *Estrada v. Ramirez* (1999) 71 Cal.App.4th 618, 620, fn. 1 [84 Cal.Rptr.2d 73] [burden on the party appealing to provide accurate record on appeal to demonstrate error; failure to do so "precludes an adequate review and results in affirmance of the trial court's determination"].) The University cannot support its new argument with evidence from the record; we, therefore, reject its challenge to the award of damages.

## DISPOSITION

The judgment is affirmed. The Regents are to pay the costs of appeal.

Haerle, Acting P. J., and Richman, J., concurred.

A petition for a rehearing was denied November 28, 2007, and on November 15, 2007, and November 28, 2007, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 23, 2008, S159036.