Filed 3/18/25  Faria v. Regents of the University of California CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HENRIQUE LAVALLE DA SILVA FARIA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A168048<br><br>(Alameda County<br>Super. Ct. No. RG20056679) |

Plaintiff Henrique LaValle Da Silva Faria (Faria) appeals from the trial court's entry of judgment in favor of defendant The Regents of the University of California (Regents) after the court sustained in part the Regents's demurrer without leave to amend and granted their Code of Civil Procedure section 437c motion (the Section 437c motion).  The Regents's victory on both motions, taken together, resolved all causes of action in Faria's Second Amended Complaint (SAC), resulting in dismissal of the case.

In the SAC, Faria sued the Regents for, among other things, breach of implied contract and negligence, the latter under different statutes in two different causes of action.  These causes of action are the subject of this appeal.  They relate to his allegations that the Regents failed in their

1

duties to him, as a foreign student in the Master of Laws (LL.M.) program at the University of California, Berkeley School of Law (Berkeley Law), to guide and assist him in applying for and obtaining authorization from the United States Citizen and Immigration Services (USCIS) to work for Ernst & Young in New York. The trial court sustained the Regents's demurrer to Faria's negligence causes of action, and having disposed of those claims, granted the Regents's Section 437c motion, finding that Faria's implied contract cause of action is unsustainable as a matter of law.

We will affirm the judgment as to Faria's negligence causes of action because the gravamen of these claims is rooted in negligent misrepresentation, which bars them on government immunity grounds under Government Code sections 818.8 and 822.2. We will reverse the summary disposition of Faria's breach of implied contract cause of action, on two grounds: first, because the trial court erred in ruling that that cause of action is barred by the statute of frauds, and second, because none of the asserted alternative bases for affirmance offered by the Regents— indefiniteness of the alleged contractual terms, failure to raise a triable issue of fact on breach, and inconsistency with federal law—has any merit.

## I. BACKGROUND

Faria filed a First Amended Complaint (FAC) against the Regents on October 5, 2020. The Regents demurred to the FAC and moved to strike portions of it. After granting the motion to strike and partially overruling and partially sustaining the demurrer, the trial court granted leave to amend. This led to the filing of the SAC on October 15, 2021, which in turn prompted the Regents to file a demurrer and a Section 437c motion seeking summary judgment or in the alternative summary adjudication. Those motions generated the orders at issue in this appeal.

## A. *Faria's Second Amended Complaint*

The narrative Faria sets forth in his SAC ends with agents of the United States Immigration and Customs Enforcement service arresting him in New York, handcuffing him, shackling him, and frog marching him to a plane bound for Brazil. Faria alleges that this traumatic and undignified deportation from the United States brought to an abrupt end to a promising career as a freshly minted LL.M graduate of Berkeley Law. How this sudden end to Faria's budding career as a Wall Street tax lawyer came about is the common denominator to each of the causes of action alleged in the SAC.

The story unfolds chronologically as follows.

Faria had a successful nine-year career as a corporate, business, and tax attorney in Brazil when he applied in 2016 to attend the LL.M. program at the Regents's prestigious law school, Berkeley Law, in order "to strengthen his knowledge of international and comparative corporate and business law." He "accepted Berkeley Law's admission offer in April 2017 for the 2017–2018 academic year and paid $1,000 as his admission deposit." He later paid more than $60,000 in tuition and fees.

Faria was an outstanding student at Berkeley Law. After distinguishing himself in the LL.M program, he obtained a job with Ernst & Young at its New York City headquarters as a Senior Advisor in its International Tax Services Practice at an annual salary of $120,000, and was eligible for additional, performance-based compensation. He was to start in August 2018, soon after his graduation from the LL.M program in May 2018. He leased an apartment in New York, purchased furniture, furnishings, and appliances for it, and submitted forms necessary to take the New York State bar examination.

3

In order to work at Ernst & Young, Faria, as a foreign national, was required to apply to the USCIS via the University of California, Berkeley (UC Berkeley) to participate in Optional Practical Training (OPT). In order to participate in OPT, he needed the USCIS to issue him an Employment Authorization Document (EAD).

The USCIS routinely issues EAD's to students applying to participate in OPT upon their graduation from an institution approved by the Department of Homeland Security's (DHS) Student and Exchange Visitor Program (SEVP), such as UC Berkeley. As an SEVP-certified institution, UC Berkeley was required to employ a Designated School Official (DSO) to work on OPT and EAD matters, and the Regents were required to certify that UC Berkeley and its DSO would comply with all federal regulations relating to EAD applications.

The Regents advised Faria via an LL.M Student Handbook (Student Handbook) that their Berkeley International Office (BIO), whose director was the school's principal DSO, was expert in navigating the OPT process and that students such as Faria should follow the BIO's instructions. It further advised, "The BIO office is your primary point of contact for questions regarding your visa status."

The BIO, the DSO, and OPT-eligible students followed a step-by-step process regarding OPT and EAD applications as outlined in Title 8 of the Federal Code of Regulations. A graduating student could submit an EAD application to the USCIS no more than 90 days before and no more than 60 days after graduation. A student began this process by completing an OPT request form to the BIO.

The DSO ensured the student was OPT-eligible and aware of his or her responsibilities for maintaining OPT status. Upon receiving an eligible

student's OPT request form, the DSO recommended the student for OPT and requested an I-20 Certificate of Eligibility from the USCIS through the Student and Exchange Visitor Information System (SEVIS), an online, secured server maintained by the USCIS. Berkeley's DSO was the only one who knew the date of this submission to the USCIS. The date was particularly important because the student had to file the EAD application with the USCIS within 30 days of the date the DSO requested an I-20 Certificate of Eligibility from it.[1]

The step-by-step process the DSO was to follow, as outlined in section 214.2 of Title 8 of the Federal Code of Regulations, was set forth in a chapter of the SEVIS User Manual and the Department of Homeland Security's webpage. The SEVIS User Manual stated the DSO was required to submit the OPT request through SEVIS and then review the information; save the OPT request, which submitted it to the USCIS and began the 30-day deadline period; print the OPT request; sign the I-20 form; and give the printed I-20 form to the student. The student was required to sign the I-20 form and submit it to the USCIS with an EAD application within the 30-day deadline period.

The Student Handbook provided to Faria contained a link to the BIO website, which in turn contained detailed information about OPT. One of the website's links was to a tutorial that explained in detail each step Faria was to take to obtain his EAD. The tutorial directed Faria to complete the Regents-prepared OPT request form and submit it to the BIO.

---

[1] It appears to be undisputed that Faria was only eligible for OPT and an EAD if he completed the LL.M. program. Had he not completed the program, as we understand the factual allegations here, he would not have been entitled to rely on the primary document forming the basis of his breach of contract allegations—the I-20 Certificate of Eligibility.

The BIO would provide Faria with an I-20 Certificate of Eligibility within three days of his submission. An instruction and illustration on a page of the tutorial indicated the USCIS needed to receive a student's OPT application no later than 30 days from the date stated on the certificate in a place indicated in the illustration.

According to Faria, the Regents breached certain duties to him by erring in their handling of his OPT request and EAD application to the USCIS, and by failing to monitor his EAD application. On April 4, 2018, in accordance with the Regents's tutorial, he submitted an OPT request form to BIO with the required fee, thereby accepting the Regents's contract offer. The Regents prepared and delivered to him an I-20 Certificate of Eligibility that set May 9, 2018 as the deadline for Faria to file his EAD application with the USCIS. The date on the certificate was the date the Regents had completed their submission to the USCIS. In actuality, however, and unbeknownst to Faria, the Regents had "prematurely" recommended his EAD to the USCIS via SEVIS on April 6, 2018, thereby setting the actual deadline for the USCIS to receive Faria's EAD application as May 6, 2018.

Moreover, the Regents and their agents failed to monitor the status of Faria's EAD application pursuant to the Federal Code of Regulations, the SEVIS User Manual, DHS's Study in the States webpage, and section 1372 of Title 8 of the United States Code. The Regents had a "grace period" of 60 days after May 9, 2018, when Faria completed his LL.M studies, to discover and cure their error, which grace period ended on July 8, 2018. No one discovered that the status of Faria's EAD application as indicated on SEVIS as of May 7, 2018 had not been converted to "pending" from "requested," "signaling the EAD application had not timely arrived

6

and therefore would be denied." Nothing was done within the grace period to correct the deadline error that was made.

Faria contacted a BIO staff person about the status of his EAD application on June 8, 2018, and contacted another BIO staff person about his application's status on June 21, 2018, telling the latter his EAD application had arrived at the USCIS on May 8, 2018. The staff person could have determined his submission was untimely by checking the date of the DSO's recommendation to the Immigration Service.

The Regents did not notify Faria of any problem with the status of his EAD application until July 24, 2018. Even after communications with Faria, the Regents's agents failed to check SEVIS for the date on which they had recommended Faria for OPT to the USCIS. Faria further alleged on information and belief that the Regents through their agents failed to reopen SEVIS until approximately August 6, 2018, when they discovered their error regarding Faria's application deadline. They then submitted a request for correction to the USCIS that was beyond the 60-day grace period, "and Faria's EAD application would therefore be denied."

On August 20, 2018, the USCIS informed Faria that it had denied his application. The Regents admitted making the error that caused this denial in two letters the principal DSO sent, one to Ernst & Young and the other to the USCIS, in late August 2018. The letters included statements that "an erroneous slide on a powerpoint [sic] presentation providing instructions to students on how to complete the [EAD] application contributed to the denial of [Faria's] application for OPT," and that Faria "was following the guidelines provided by the [BIO]," which included "a box with instructions [that] erroneously pointed to the date on page two of the

7

I-20 as the deadline date by which students needed to have their completed application at [the USCIS]."

Faria alleged he "performed each and every term and covenant of the agreement [with the Regents] he was obligated to perform." Nonetheless, due to the Regents's breach of their agreement, he "lost the opportunity to use his year with Ernst & Young as a steppingstone for a lateral move to other international law and accounting firms or to . . . international companies . . . ," lost his opportunity to take the New York State bar examination, accumulated more than $48,000 in debt to pay his living expenses in Berkeley and his job-related expenses in New York City, and was arrested and deported.

Faria wrote to the BIO on September 7, 2018, informing it that he had exhausted all of his funds and would soon lose his job, and asking for help. The principal DSO wrote back the next day that "we do not have the resources to support you any further," and advised Faria "to look at options that are least costly to you including going home and waiting for any further decisions." The Regents also modified the documents on the Berkeley Law and BIO websites regarding OPT, impliedly admitting their liability to Faria by doing so.

Based on all or almost all of these factual allegations,[2] Faria sought damages from the Regents in six tort causes of action and a breach of implied contract cause of action. Three are the subjects of this appeal:

---

[2] Faria excluded from his second cause of action, for negligence under Government Code section 815.2, and his fifth cause of action, for negligence under Government Code section 815.6 (two of the three causes of action that are the subject of this appeal), two paragraphs that referred to the school's tutorial illustration indicating that a student's application had to be received by the USCIS no later than 30 days from a date stated in a particular place on the I-20 Certificate of Eligibility.

Faria's breach of implied contract cause of action (his first cause of action), his negligence cause of action under Government Code section 815.2 (his second), and his negligence cause of action under Government Code section 815.6 (his fifth).

The theory of damages underlying these three causes of action is that the Regents's various breaches of duty and failures to act were the proximate cause of Faria's arrest, deportation, loss of his job at Ernst & Young, loss of future earnings, severe emotional distress, and of ongoing and permanent damage to his reputation.

## B. *The Regents's Demurrer to Faria's Second Amended Complaint*

The Regents demurred to Faria's SAC, which Faria opposed. On April 22, 2022, the trial court overruled the demurrer to the breach of implied contract cause of action, concluding it was an improper motion for reconsideration of the court's previous demurrer ruling regarding Faria's FAC. The court sustained without leave to amend the Regents's demurrer to all of the negligence causes of action.

Regarding the second cause of action, for negligence under Government Code section 815.2, the court ruled Faria did not identify a statutory "enactment" as a basis for imposing a mandatory duty on the Regents's agents. It concluded the subject regulations in Title 8 of the Federal Code of Regulations and the SEVIS User Manual did not require DSOs to set forth the correct date in the I-20 Certificate of Eligibility by which an applicant had to file his EAD application with the USCIS, thereby indicating "that Congress did not intend to create a right to sue should the individuals make errors in discharging their obligations."

The court sustained the demurrer to the third cause of action, for negligent misrepresentation under Government Code section 815.2,

9

concluding it was barred by government immunity under Government Code sections 818.8 and 822.2.

For the same reasons the court sustained the demurrer to the second and third causes of action, it sustained the Regents's demurrer to the fourth, through seventh causes of action, which included the fifth cause of action for negligence under Government Code section 815.6, as well as negligent misrepresentation and negligent interference causes of action.

The Regents also moved to strike the tort damages alleged in the SAC. The court granted this motion.

### C. *The Regents's Section 437c Motion*

The Regents subsequently moved under Code of Civil Procedure section 437c for summary judgment or in the alternative for summary adjudication on Faria's implied contract cause of action. It argued that Faria cannot establish the Regents's liability on an implied contract theory because (1) the statute of frauds, Civil Code section 1624, renders the implied contract unenforceable as an oral contract that cannot be completed within a year and for which no exception to the statute applies, (2) the terms of the contract are not reasonably certain; (3) Faria cannot not establish a material breach; and (4) federal law preempts his claim.

Opposing in all respects, Faria took the position that the statute of frauds does not apply to the parties' implied contract because it consists of multiple material terms that were not all agreed to until April 2018, within a year of full performance of the agreement, and that, in any event, the alleged contract can be performed within a year, which is an exception to the statute of frauds. Faria also disputed a number of the material facts on which the Regents's Section 437c motion was based, and objected to some of the evidence the Regents submitted in support of those facts. The

10

Regents's reply included objections to some of the evidence Faria submitted to the court as well.

In a written order filed March 17, 2023, the trial court granted the Regents's Section 437c motion on the ground that the implied contract cause of action is barred by the statute of frauds as an oral agreement that cannot be performed within a year of its making in April 2017, when Faria accepted the Regents's enrollment offer. The court rejected Faria's contention that the agreement was amended multiple times, including as late as April 2018, as contradicted by his SAC allegations and because he did not submit any admissible evidence in support of this contention. It also concluded that, as the Regents argued, Faria's full performance amounted to the mere payment of money and so did not qualify as an exception to the statute of frauds.

The court chose not to address the other grounds the Regents asserted in support of their Section 437c motion, but noted "that summary judgment is rare in cases involving an alleged breach of contract because triable issues of material fact are easy to find as to the terms of the contract and its alleged breach." The court also stated it would not rule on Faria's evidentiary objections because they were not material to the disposition of the motion. It sustained five of the Regents's 11 evidentiary objections, all related to Faria's allegations that the implied contract was constituted of several material terms that were not agreed to in full until April 2018.

The trial court entered judgment in favor of the Regents. Faria filed a timely notice of appeal from this judgment.

11

## II. DISCUSSION

### A. *The Statute of Frauds Does Not Bar Faria's Breach of Implied Contract Cause of Action*

Faria first argues the trial court erred for multiple reasons in granting the Section 437c motion. We agree. Drawing all inferences for Faria as the party opposing the motion, and exercising de novo review, we conclude as a matter of law that the earliest point in time the contract could have incepted is September 2017, when Faria arrived at school and began paying tuition, and as a result, the contract could have been performed within a year. The Regents's statute of fraud defense is therefore meritless.

#### 1. Legal Standards

##### a. *Standard of Review*

Our review is de novo. As a panel of this appellate division recently explained, "If, on a motion for summary judgment or summary adjudication, 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law,' then a grant of the motion is warranted. ([Code Civ. Proc., ]§ 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 (*Aguilar*).) 'We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards.' " (*Apex Solutions, Inc. v. Falls Lake Ins. Management Co., Inc.* (2024) 100 Cal.App.5th 1249, 1256 (*Apex*).)

"Under *Aguilar*, the movant initially carries the burden of making a prima facie showing in its favor. ([Code Civ. Proc., ] § 437c, subd. (p)(1); see *Aguilar*, *supra*, 25 Cal.4th at p. 849.) 'The prima facie showing by the moving party must be such that it would, if uncontradicted, entitle the

moving party to judgment as a matter of law. [Citation.] That is, "a moving defendant must present evidence which, if uncontradicted, would constitute a preponderance of evidence [i.e., show it is more likely than not] that an essential element of the plaintiff's case cannot be established." ' [Citation.] Upon an adequate prima facie showing by the movant, 'the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.'

"Upon a showing that 'one or more elements of the cause of action cannot be established,' the burden shifts to the nonmovant to 'demonstrate a triable issue of material fact exists.' [Citations.] 'In evaluating whether there is a triable issue of material fact, we must view the evidence in the light most favorable to the opposing party by "strictly constru[ing]" the evidence of the moving party, "liberally constru[ing]" that of the opposing party, and resolving any doubts' " against summary disposition. (*Apex*, *supra*, 100 Cal.App.5th at pp. 1256–1257.)

b. *Statute of Frauds*

" ' "The primary purpose of the Statute [of Frauds] is evidentiary, to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made." ' " (*Estate of Duke* (2015) 61 Cal.4th 871, 889.) Consistent with this purpose, Civil Code section 1624 provides in relevant part that a "contract [is] invalid, unless [it], or some note or memorandum thereof, [is] in writing and subscribed by the party to be charged or by the party's agent," if the contract "by its terms is not to be performed within a year from the making thereof." (Civ. Code, § 1624, subd. (a)(1).)

"It is a well-established rule in California that an oral contract is invalid under [Civil Code section 1624] only where by its *very terms* it

13

cannot be performed within a year from the date it is made." (*Plumlee v. Poag* (1984) 150 Cal.App.3d 541,548, original italics.) " 'In its actual application . . . the courts have been perhaps even less friendly to this provision [the "one year" section] than to the other provisions of the statute [of frauds]. They have observed the exact words of this provision and have interpreted them literally and very narrowly. . . . To fall within the words of the provision, therefore, the agreement must be one of which it can truly be said *at the very moment it is made*, "This agreement is not to be performed within one year"; in general, the cases indicate that *there must not be the slightest possibility that it can be fully performed within one year*.' " (*White Lighting Co. v. Wolfson* (1968) 68 Cal.2d 336, 343, fn. 2, original italics (*White Lighting Co.*); accord, *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 674, fn. 18 (*Foley*).)

2. **The Statute of Frauds Did Not Bar Faria's Breach of Implied Contract Cause of Action Because the Contract Could Be Performed Within a Year**

The pivotal issue on which the statute of frauds analysis turns is the date the implied contract alleged by Faria incepted. In the Regents's framing—which they contend rests on a legal position Faria took in answering a contention interrogatory presented to him in discovery—the contract was formed in April 2017, when Faria accepted a written offer of admission into the LL.M. program and paid tuition. In Faria's framing, on the other hand, the formation of the contract is evidenced by a series of transactions, starting in April 2017 with an offer of admission, Faria's acceptance, and Faria's payment of a $1,000 deposit; and Faria's receipt of a Student Handbook in July 2017 detailing by cross-reference to other published materials, including a tutorial describing the OPT application process. According to Faria's evidence, the tutorial he received in July

14

2017 described in detail (i) how and when Faria was to submit an OPT application to the BIO, (ii) how and when Faria's OPT application would then be submitted by the BIO to the USCIS, with BIO's recommendation that USCIS accept Faria for OPT, and (iii) how and when, once the USCIS accepted the BIO's recommendation—thereby producing an I-20 Certificate of Eligibility—Faria would be able to complete the final step in the process, the submission of his EAD application directly to the USCIS.

Under Faria's view of the evidence, there was a narrow window of time—30 days—for the timely completion of the elaborate, multistep EAD application process, starting from the date the BIO made its submission to USCIS, a date Faria claims was known only to the BIO. Because the BIO was in sole control of its own steps in the process, Faria claims that, until the BIO gave him the deadline for submission of his EAD application to the USCIS, he did not know and was not in a position to know the status of the process after initiating everything by submitting his OPT application to BIO at the front end of the process. The gist of Faria's theory, as we understand the evidence, is that it was absolutely critical for the BIO to give him the correct deadline to submit his EAD application to the USCIS, but due to the BIO's negligence, he was given an incorrect date, which caused the rejection of the application and ultimately his deportation.

The Regents persuaded the trial court to accept its theory that Faria is bound by the legal position he took in discovery about the inception date of the alleged implied contract. Under this view of the evidence, the Regents had no contractual obligation to assist Faria with his OPT and EAD applications unless he completed the LL.M program in May 2018, which was beyond the first year of the parties' contract as Faria alleges it. Critically, this theory turns on an argument that, to quote from the

15

Regents's Separate Statement of Undisputed Material Facts Number 10 (SSUMF No. 10), Faria "entered into an 'implied' contract with The Regents when he accepted Berkeley Law's admission offer in April 2017 for the 2017-2018 academic year and paid tuition." But that is not what the interrogatory answer on which the Regents rely in SSUMF No. 10 actually says. The answer in question says nothing about payment of tuition. According to a declaration submitted in opposition to the Regents's section 437c motion, Faria did not pay tuition until he arrived at school in September 2017.[3] He paid Fall Semester tuition of $30,066.50 on September 7, 2017, and Spring Semester tuition of $28,750.50 in "early January 2018." All he paid in April was a small deposit of $1,000 to secure his place in the 2017–2018 LL.M. program upon arrival at school, and for which he was credited as part of his total tuition payment.

On the strength of this evidence, Faria disputed SSUMF No. 10 and offered a legal theory based on his "series of transactions" framing of the facts. He contended that there was an "original agreement" in April 2017 followed by three more agreements at later points in time, one of which was when he enrolled in September 2017, another in January 2018 when

---

[3] The court sustained various objections to statements in this declaration. To the extent the declaration purported to offer legal conclusions about the contract at issue, those rulings were of course proper and appropriate. But the declaration makes statements on Faria's personal knowledge and attaches documentary receipts confirming that he made various payments to the Regents on various dates (i.e., his initial deposit in April 2017 and his tuition payments in September 2017 and January 2018). This proffered evidence was plainly admissible. To the extent the trial court sustained objections to Faria offering his own percipient knowledge of facts and documentary proof supporting it on matters that are directly relevant to the issue of contract formation, its ruling was an abuse of discretion.

16

he paid his Spring Semester tuition, and another was in April 2018 when he submitted his OPT request to BIO along with a $100 check for the processing of that request. He also contended that the terms of the "original agreement" did not include the specific contractual commitments that were breached, and that those terms did not become a part of the contract until he paid tuition later.

The Regents do not dispute that, on Faria's side of the contract that was allegedly breached, the payment of tuition is the only contractual term obligating Faria to perform. Indeed, by their own theory, as articulated in their argument that Faria is bound by his interrogatory answer "admitting" that the implied contract he alleged was formed in April 2017, that is the only consideration on his side of the bargained for exchange. If a mutually binding contract was formed at that point, it cannot have been the contract that was allegedly breached here. Imagine, for example, that in the summer of 2017 Faria had decided to attend some other LL.M. program and opted not to show up for school at Berkeley in the Fall; under those circumstances, the Regents would have no viable argument that Faria owed them tuition, nor would Faria have had any viable argument that the Regents breached some obligation to assist him with an EAD application, since he never attended their LL.M. program.

Even if we accept the Regents's core idea—that Faria himself has taken the position he entered into some form of implied contract in April 2017—we cannot rule out the possibility that Faria might be able to overcome the Regents's statute of frauds defense at trial, whether under a theory that the parties entered into more than one contract, or under some other theory. It may be, for example, that legally what we have is an option contract, with a firm offer having been made in April 2017 (secured

17

by a $1,000 deposit), followed by the acceptance of the offer and the exchange of mutual consideration (Faria making his first tuition payment, and Berkeley Law beginning to deliver educational services) in September 2017.

The bottom line is that, no matter how the facts are interpreted legally, we believe the undisputed evidence in the record shows that, as a matter of law, under both sides' characterization of the implied contract at issue, the inception date of the allegedly breached contract was September 2017 *at the earliest*, when Faria arrived at school and began paying his tuition. At this procedural juncture in the case, it is too early to say whether, at trial, Faria will be able to advance a viable legal theory of contract that is consistent with the position he took in discovery. All we hold here is that he should not be foreclosed from trying to do so based on a factual mischaracterization of the position he took in discovery.[4]

**B. *The Regents's Other Grounds for Affirming the Grant of Their Section 437c Motion Lack Merit***

The Regents argue in the alternative that we should also affirm the judgment based on the other grounds they asserted in support of their Section 437c motion, even though the trial court declined to rule on them. We conclude these other grounds lack merit.

**1. Faria Pleaded the Implied Contract's Terms with Reasonable Certainty**

The Regents first argue Faria could not establish that the parties agreed to any enforceable implied contract because he did not allege the

---

[4] Faria asserts various other grounds in support of his argument that the trial court erred in concluding the statute of frauds bars his implied contract cause of action. We have no occasion to pass upon these other asserted grounds of error.

terms of that contract with any reasonable certainty.  The trial court declined to address this issue, merely noting that summary disposition is rare in breach of contract actions because triable issues of fact are relatively easy to find, but rejected a version of it in overruling in part the Regents's demurrer to Faria's First Amended Complaint.  Although Faria does not expressly address this "reasonable certainty" argument, he cites to the trial court's rejection of that argument in its demurrer ruling.  We conclude the Regents's argument is unpersuasive.

"An implied contract is one, the existence and terms of which are manifested by conduct."  (Civ. Code, § 1621.)  " '[C]ourts seek to enforce the actual understanding of the parties to a contract, and in so doing may inquire into the parties' conduct to determine if it demonstrates an implied contract.'  [Citation.] . . . Whether the parties' conduct creates such implied agreements is generally 'a question of fact.'  [Citation.]  Implied contractual terms 'ordinarily stand on equal footing with express terms.' "  (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 463.)

The law of contracts as applied to student-public university relationships was neatly summarized by Division Two of this district in *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809 (*Kashmiri*).  "[T]he basic legal relationship" between a student and state university "is contractual in nature."  (*Id*. at p. 823–824.)  " ' "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created . . . ." '  [Citations.]  When a student is attending a publicly financed institution of higher education, . . . attendance is regarded as a benefit somewhat analogous to that of public employment.  [Citations.]

19

"Although courts have characterized the relationship between the student and educational institution as contractual, they have recognized that contract law should not be strictly applied. ' "The student-university relationship is unique, and it should not be and can not be stuffed into one doctrinal category. . . ." ' [Citation.] Universities are entitled to some leeway in modifying their programs from time to time to exercise their educational responsibility properly. [Citation.] Additionally, courts have often deferred to any challenge based in contract to universities' academic and disciplinary decisions." (*Kashmiri*, *supra*, 156 Cal.App.4th at pp. 824–825, fn. omitted.)

"Courts have applied contract law flexibly to actions involving academic and disciplinary decisions by educational institutions because of the lack of a satisfactory standard of care by which to evaluate these decisions. [Citations.] Courts also have been reluctant to apply contract law to general promises or expectations. [Citation.] Courts have, however, not been hesitant to apply contract law when the educational institution makes a specific promise to provide an educational service, such as a failure to offer any classes or a failure to deliver a promised number of hours of instruction. [Citations.] Courts have uniformly held that a contract between an educational institution and a student 'confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced.' " (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 826, fn. omitted.)

"In interpreting the contract, we must 'give effect to the mutual intention of the parties as it existed' at the time the contract was executed." (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 831, quoting Civ. Code, § 1636.) "[W]e look to the reasonable expectation of the parties at the time

20

of contract.  To determine the reasonable expectation of the parties we examine 'the totality of the circumstances . . . .  Agreement may be " 'shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances.' " ' " (*Kashmiri*, at p. 832.)  "The reasonableness of the student's expectation is measured by the definiteness, specificity, or explicit nature of the representation at issue." (*Ibid*.)

The Regents rely heavily on the reference in *Kashimiri* and other appellate opinions to the flexibility required in analyzing contracts between students and universities regarding academic and disciplinary matters.  They contend the terms of such contracts "generally contain only two implied conditions:  the student will not be arbitrarily expelled, and the student will submit himself to reasonable rules and regulations."  This goes too far.  As the *Kashmiri* court made clear, such flexibility is to be employed primarily regarding academic and disciplinary matters, and courts "have not been hesitant to apply contract law when the educational institution makes a specific promise to provide an educational service." (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 826.)

The Regents also argue that Faria's breach of implied contract claim fails for lack of reasonable certainty because he only "refers to various unidentified documents, websites, and verbal information to support his claim that an implied contract existed, but he acknowledges that it was the 'totality of these communications' that set the terms of the alleged implied contract, and he does not identify a single specific promise made by anyone on behalf of The Regents related to his specific claim that Berkeley Law either (1) promised to provide him with accurate information (or any information) related to his I-20 Certificate of Eligibility, or (2) promised

21

him anyone would 'monitor' SEVIS in the way he allegedly expected. Rather, he seeks to have the terms of the alleged contract imposed in retrospect."

As *Kashmiri* also makes clear, there is nothing wrong with Faria basing his breach of implied contract claim on the totality of communications between the parties. (*Kashmiri*, *supra*, 156 Cal.App.4th at p. 832.) And we disagree with the Regents's contention that Faria's breach of implied contract allegations were too vague to support such a claim. Faria alleged in the SAC that he attended the LL.M. program in order to advance his already successful legal career, that he obtained a job in the United States, and that the Regents included as part of their LL.M. program the assistance of an office, the BIO, and its DSO, to assist eligible foreign students in participating in OPT and obtaining the EAD from the USCIS needed for them to work in the United States after their completion of the LL.M. program. Further, Faria alleged that the Regents advised him via the Student Handbook that the BIO, led by the principal DSO, was expert in navigating the OPT/EAD process and that students such as Faria should follow the BIO's instructions. It further advised, "The BIO office is your primary point of contact for questions regarding your visa status."

Faria further alleged that the Regents agreed that the DSO, upon receiving an eligible student's OPT request form, recommended the student for OPT and requested an I-20 Certificate of Eligibility from the USCIS through SEVIS, the online, secured server maintained by the USCIS. UC Berkeley's DSO was the only one who knew the date of this submission to the USCIS. The date was particularly important because the student had to submit the EAD application to the USCIS within 30

22

days of the date the DSO requested an I-20 Certificate of Eligibility from the USCIS.

Most importantly, the Student Handbook provided to Faria contained a link to the BIO website, which in turn contained detailed information about OPT. One of the website's links was to a tutorial that explained in detail each step Faria was to take to obtain his EAD. The tutorial directed Faria to complete the Regents-prepared OPT request form and submit it to the BIO. The BIO would provide Faria with an I-20 Certificate of Eligibility within three days of his submission. An instruction and illustration on a page of the tutorial indicated the USCIS needed to receive a student's OPT application no later than 30 days from the date stated on the certificate, as indicated in the illustration.

These allegations are sufficiently certain to raise triable issues of fact as to whether the Regents had agreed to provide Faria with accurate information on his I-20 Certificate of Eligibility. It is arguable that implied in the agreement between the parties was that foreign students were to rely entirely on the BIO, which would use its considerable expertise and unique access to information, such as the deadline for a student's submission of an EAD application to the USCIS, to guide foreign students through the OPT/EAD process. Most significantly, the totality of these alleged communications indicates the Regents specifically instructed the student, in a website the link for which was provided in the Student Handbook, to submit his EAD application within 30 days of the date stated by the Regents in the I-20 Certificate of Eligibility the Regents's agents filled out and gave to the student. Arguably, it was reasonable for Faria to rely on this communication as a part of the parties' implied contract. (See *Kashmiri*, *supra* 156 Cal.App.4th at p. 832 ["Cases involving contractual

23

obligations of colleges based on language in catalogues or handbooks focus on what is reasonable."].) Moreover, Faria alleges that the school's principal DSO acknowledged in a letter to Ernst & Young that the school's error in its illustrated instructions to Faria contributed to the USCIS's denial of his application, arguably suggesting by this action that the Regents recognized they had a contractual obligation to provide accurate information.

Also, Faria's allegations and the Regents's contentions raise triable issues of fact regarding whether the Regents's assistance included monitoring a student's EAD application in order to aid an eligible student to obtain an EAD. Faria's allegations of the parties' conduct suggests this—he alleges that after he filed his EAD application he twice called the BIO and spoke to staff people there about the status of his application. Moreover, in their brief in support of their Section 437c motion, the Regents asserted in arguing that Faria could not show a material breach (an issue we will next discuss), "There is no dispute that BIO used SEVIS to create the deadline conveyed to Mr. Faria in connection with his EAD application and that BIO monitored SEVIS to track his application. . . . Further, he contacted BIO multiple times to inquire about his SEVIS records and each time BIO was able to access his information (which they were maintaining through SEVIS) to provide him with the requested information. BIO supported Mr. Faria in all his endeavors, both before and after his application was declined." The Regents repeat these contentions on appeal.

In short, the Regents fail to establish that their arguments do anything more than dispute issues of fact regarding the implied contract's

24

terms, which is not a basis for summary disposition by Section 437c motion.

### 2. There Are Triable Issues of Facts Regarding Whether the Regents Materially Breached the Implied Contract

The Regents next argue that even if we conclude Faria alleges the terms of an enforceable implied contract between the parties, he "has not established a question of fact as to any material breach," a separate and independent ground for affirming the trial court's judgment regarding Faria's breach of implied contract cause of action that the Regents raised below and the trial court did not address. This argument is also unpersuasive.

According to the Regents's papers below, Faria's interrogatory responses indicate he in fact received the correct information from the BIO about his EAD filing deadline. In their separate statement of undisputed facts in support of their Section 437c motion, the Regents asserted that Faria contended the I-20 Certificate of Eligibility he received "reflected two different dates from which his thirty-day deadline to submit his application was to be calculated" but that Faria "never questioned the discrepancy," and that in any event the Federal Code of Regulations indicates the student is responsible ultimately to ensure that the information he receives is correct and his application is submitted properly. These contentions raise nothing more than issues of fact in light of Faria's allegation, unchallenged by the Regents, that the Student Handbook led him to an online illustration of where a date was stated on the I-20 Certificate of Eligibility by which he was to calculate his EAD filing deadline, and that the date listed on the certificate he received was incorrect, all of which the Regents's principal DSO admitted in a letter to Ernst & Young.

25

The Regents further contend regarding their monitoring obligation that, as we have already indicated, they tracked Faria's application, accessed his information upon his inquiries and provided him with the requested information and, accordingly, "performed [their] obligations related to the implied contract." Once again, the Regents are merely raising disputed issues of fact in light of Faria's allegations that the Regents failed to properly monitor his application by not discovering in time for a correction to be made that, according to SEVIS, his application was merely "requested" rather than "pending" before the USCIS.

The Regents also contend, regarding Faria's negligence claims, that, based on their reading of certain provisions of the Federal Code of Regulations and the SEVIS manual attached to the SAC, Faria incorrectly alleged they could correct their error with the USCIS during a post-EAD application filing "grace period." Faria contests this contention on various legal and factual grounds. We need not resolve this dispute, however, because the Regents do not contest Faria's allegation in his breach of implied contract cause of action that, "[h]ad the DSOs and the Regents discovered" on May 7, 2018 that Faria's application was not "pending" before the USCIS, "as they were obligated to do, Faria would have had numerous options to preserve his career path . . . ." Regardless of *the Regents's* ability to take corrective measures (and the Regents do not contest Faria's SAC allegation that they did just that, "submitt[ing] a request for correction to [the USCIS] in relation to Faria's EAD application . . . beyond the 60-day grace period"), they do not dispute that *Faria* had options if the BIO had monitored his application and told him it was filed late.

26

For these reasons, the Regents's "lack of a material breach" argument also is not a basis for summary disposition by Section 437c motion.

### 3. The Regents Fail To Establish Faria's Breach of Implied Contract Claim is Inconsistent with Federal Law

Finally, the Regents argue in a somewhat summary fashion that we must affirm the trial court's grant of their Section 437c motion because Faria relies on certain provisions in the Federal Code of Regulations for the terms of the parties' implied contract, but these sections do not include "any provisions related to a university's obligation to correctly set the deadline, or monitor a student's status; rather, they require the university to perform administrative actions related to the student's application . . . ." Accordingly, the Regents argue, "Mr. Faria's theory of liability rewrites the statutory requirements and shifts the responsibilities inconsistent with actual federal law," thereby "creating a conflict with federal law" and interfering with the "federally regulated scheme related to immigration control: the sole jurisdiction of the federal government." They suggest Faria should have sued "the entity that put him in his current position," the USCIS.

This argument is unpersuasive because it is based on the incorrect premise that Faria bases the terms of the parties' implied contract on the Regents's obligations under federal law. True, Faria cites federal regulations in discussing what the Regents were required to do for students such as him who sought OPT training and an EAD. But he also alleges what the Regents *agreed to do contractually* on his behalf: to give him the correct date for his EAD application deadline and to monitor his application after he filed it with USCIS. He provides a basis for these allegations on things that stand separate from any federal law, such as the

27

Student Handbook's instructions and the parties' conduct, e.g., that the Regents stated in the Handbook that students such as Faria were to look to the BIO office as a "primary point of contact for questions regarding your visa status" and follow the BIO's instructions; that the Student Handbook indicated that the BIO would give him an I-20 Certificate of Eligibility and where on it the BIO would state the date from which he was to calculate his EAD application deadline; that the BIO gave him an I-20 Certificate of Eligibility with the wrong date stated on it; and that the Regents through its agents failed in their contractual duty to monitor his application after he filed it, including despite his inquiries into it.

The Regents fail to explain why, or cite any law establishing that, federal law prohibited the parties from entering into such contractual agreements. The case law they cite goes to general propositions regarding conflicts between state and federal laws, the application of which to the particular circumstances of this case they do not meaningfully explain (see *Altria Group, Inc. v. Good* (2008) 555 U.S. 70, 76–77 ["[p]re-emptive intent may . . . be inferred if the scope of the [federal] statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law"]; *Hines v. Davidowitz* (1941) 312 U.S. 52, 66–67 ["states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations" where the federal government "has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens"]; *Fiallo v. Bell* (1977) 430 U.S. 787, 792 [Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens"]). And the fact remains that, regardless

of what the Regents's obligations under federal law might or might not have been, Faria's breach of implied contract claim does not ultimately rest on, as the Regents contend, his "effort to read into the federal regulations specific requirements that do not explicitly exist and to incorporate them into an alleged implied contract," thereby "seek[ing] to modify federal regulations regarding immigration in a way unsupported by federal preemption law because he is requesting the Court to impose a contractual remedy inconsistent with specific federal regulations on the same issues, conflicting with the federal government's exclusive control related to immigration." Faria seeks damages for the breach of contractual terms he alleges were agreed to by the parties, not for a ruling that his interpretation of federal regulation requirements should be incorporated into the parties' contract. Therefore, the Regents do not establish that their federal law preemption claim is a basis for summary disposition.

## C. *The Negligence Causes of Action Are Barred by Government Immunity*

Faria next argues the trial court erred in sustaining the Regents's demurrer to his two negligence causes of action, including because they are not barred by the government immunity provided in Government Code sections 818.8 and 822.2. We conclude the trial court did not err because his two negligence causes of action are barred by those provisions.

### 4. Legal Standards

" 'A demurrer is properly sustained when "[t]he pleading does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.10, subd. (e).) On appeal, a resulting judgment of dismissal is reviewed independently. [Citation.] " ' "[W]e accept as true all the material allegations of the complaint" ' " [citation], but do not "assume the truth of contentions, deductions or conclusions of law" [citation].'

29

[Citation.] 'We liberally construe the pleading with a view to substantial justice between the parties.' [Citations.] 'If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer.' " (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 605.)

" ' "We affirm if any ground offered in support of the demurrer was well taken but find error if the plaintiff has stated a cause of action under any possible legal theory. [Citations.] We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." ' " (*California Resources Production Corp. v. Antioch City Council* (2024) 107 Cal.App.5th 481, 489.)

Also, " '[w]hen a demurrer is sustained without leave to amend, it is the duty of the reviewing court to decide whether there is a reasonable possibility that the defect can be cured by amendment. . . . It is the plaintiff's burden to show the reviewing court how the complaint can be amended to state a cause of action.' " (*Thomas v. Regents of University of California, supra*, 97 Cal.App.5th at p. 605.)

The parties agree that the Regents are a "public entity" as defined by Government Code section 811.2.[5] "Tort claims may not be maintained against a public entity unless they are based on a statute or are required by the federal or state constitutions. [Citation.] Except as otherwise provided by statute, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or other person, and any such liability established is subject to

---

[5] Government Code section 811.2 provides in relevant part, " 'Public entity' includes . . . the Regents of the University of California . . . ."

30

the immunity provisions of the Government Code.  (Gov. Code, § 815.)  A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his or her employment if the act or omission would have given rise to a cause of action against the employee, unless the employee is immune from liability.  (Gov. Code, § 815.2.)  Government Code section 818.8 provides public entities immunity from liability for intentional or negligent misrepresentations of government employees." (*Lundeen Coatings Corp. v. Department of Water & Power* (1991) 232 Cal.App.3d 816, 832 (*Lundeen Coatings Corp.*).)

Specifically, Government Code section 818.8 provides, "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."  Further, Government Code section 822.2 provides, "A public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice."  Also, subdivision (b) of Government Code section 815.2, upon which Faria relies for one of his negligence claims, provides, "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

" ' "[M]isrepresentation" as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial or economic interest.  The Legislature designed section 818.8 to exempt the governmental entity from this type of liability.' (*Johnson v. State of California* (1968) 69 Cal.2d 782, 800.)  Immunity will prevail . . . even if the misinformation relied upon is gratuitously disseminated or the

31

allegations of the complaint are couched in terms of code violations by the government entity and not misrepresentations per se. ([*Tokeshi v. State of California* (1990) 217 Cal.App.3d 999,] 1006–1007.)" (*Lundeen Coatings Corp.*, *supra*, 232 Cal.App.3d at p. 832.)[6]

### 5. Proceedings Below

In his SAC, Faria alleged both "negligence" and "negligent misrepresentation" causes of action. In his second cause of action, for "negligence" under Government Code section 815.2,[7] Faria incorporated by reference almost all of the preceding allegations in the SAC (again, excluding only the two paragraphs referring to the tutorial illustration of how to calculate his EAD application deadline from a date stated in a particular place on the I-20 Certificate of Eligibility) and alleged that the

---

[6] The *Lundeen* court went on to cite numerous cases in which immunity was found to bar misrepresentation claims, such as where "the department of building and safety erroneously notified an individual that her activities violated a zoning ordinance (*Brown v. City of Los Angeles* (1968) 267 Cal.App.2d 849; the DMV negligently provided a certificate of ownership for a stolen automobile (*Hirsch v. Department of Motor Vehicles* (1974) 42 Cal.App.3d 252); a city misstated that dwellings on real property were legally authorized (*Grenell v. City of Hermosa Beach* (1980) 103 Cal.App.3d 864); and city inspectors misrepresented and suppressed facts concerning a structure's compliance with the building code (*Harshbarger v. City of Colton* (1988) 197 Cal.App.3d 1335)." (*Lundeen Coatings Corp.*, *supra*, 232 Cal.App.3d at p. 833.)

[7] Government Code section 815.2 states:

"(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

"(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

32

Regents and their agents, such as the school's DSOs, owed Faria "a duty to prepare his I-20 and his EAD application with due care, monitor the status of his EAD application on SEVIS, and warn him if it placed his F-1 status in peril." Further, Faria alleged, "[b]y prematurely recommending Faria's EAD on April 6, 2018 . . . to [the USCIS] and thereby setting a deadline of May 6, 2018, for the filing of Faria's EAD application with [the USCIS], while setting a different date on Faria's I-20 certificate of eligibility, Defendant breached its duty of care pursuant to 8 C.F.R. § 214.2(f)(11), the SEVIS User Manual, and DHS's mandates on its Study in the States webpage. According to Defendant's own records, it did not complete Faria's I-20 Certificate of Eligibility until April 9, 2018, and therefore should have set the deadline for Faria to file his EAD application with USCIS for May 9, 2018." He further alleged that the Regents, through their agents, failed to monitor his EAD application and thereby detect their error, and timely correct it with the USCIS. Faria contended that the Regents's negligence was the proximate cause of the resulting harm suffered by him, including his arrest, deportation, loss of his job, and loss of future earnings.

In his fifth cause of action, for negligence under Government Code section 815.6,[8] Faria again incorporated by reference almost all of the preceding allegations in the SAC (with the exception of the two paragraphs discussing the tutorial illustration) and alleged that the Regents, pursuant to certain federal regulatory requirements, had mandatory duties to him

---

[8] Government Code section 815.6 states, "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

that were essentially the same as those duties of care he alleged in his second cause of action, for negligence under Government Code section 815.2, resulting in the same harm.

In support of their demurrer, the Regents argued, among other things, that all of Faria's negligence causes of action were barred by the government immunity provided in Government Code sections 818.8 and 822.2. The trial court sustained the demurrer to Faria's fifth cause of action, for negligence under Government Code section 815.6, including because it was barred by government immunity, but asserted a different ground for sustaining the demurrer to his second cause of action, for negligence under Government Code section 815.2.

### 6. Analysis

Faria argues his two negligence causes of action are not barred by Government Code sections 818.8 and 822.2 because they do not rely on any misrepresentations, and that any misrepresentations alleged in the SAC are collateral to these claims. Relying almost entirely on federal case law recognizing federal tort claims based on negligence in the performance of operational tasks where misrepresentations are not considered to be the gravamen of the claims (see *Guild v. United States* (9th Cir. 1982) 685 F.2d 324, 325–326; *Mundy v. United States* (9th Cir. 1993) 983 F.2d 950, 952; *Saraw Partnership v. United States* (5th Cir. 1995) 67 F.3d 567, 570; *Abbey v. United States* (9th Cir. 2024) 112 F.4th 1141, 1151; *Estate of Rideout By and Through Woods v. United States* (S.D.Cal. 2023) 677 F.Supp.3d 1112, 1120–1121; *Dalgic v. Misericordia Univ.* (M.D.Pa., July 3, 2019, No. 3:16-CV-0443) 2019 U.S.Dist. Lexis 111203, pp. *81–*83 [involving a school's negligence in the handling of a foreign student's OPT application, but not involving any negligent misrepresentations allegations]; *Ilczyszyn v. Southwest Airlines Co.* (2022) 80 Cal.App.5th 577, 614), he asserts his two

34

negligence claims allege seven failures in the performance of operational tasks by the Regents that violated their duty of care to him under section 815.2 and their mandatory duty to him under section 815.6. That is, he contends, the Regents prematurely requested OPT for Faria in SEVIS on April 6, 2018; posted April 9, 2018 as the day of recommendation, thereby setting May 9, 2018 as Faria's filing deadline; did not have a system to monitor, detect, or report their error; failed to check SEVIS regarding Faria's application, even when he twice requested updates; did not check SEVIS until long after deadlines had passed and the "grace period" had ended; and notified Faria that it could provide no further assistance.

The Regents contend that Faria's argument fails regardless of his characterization of his two negligence causes of action because at the core of these causes of action are allegations of negligent misrepresentation. We agree. Faria's allegations rest on, and the gravamen of these causes of action is, his contention that the Regents misrepresented to him the date of their submission regarding him to the USCIS, thereby causing him to miss the deadline for his filing of his EAD application with the USCIS and dooming the chances of his application being accepted.

This gravamen is indicated by the numerous allegations Faria made and relied on in both of his negligence causes of action. Notably, for both causes of action, Faria incorporated all of the preceding allegations in the SAC "as though fully set forth" in these causes of action, with the exclusion of two paragraphs referring to the school's tutorial illustration. Therefore, both causes of action include the allegations that: the Regents advised Faria via the Student Handbook to follow the BIO's instructions regarding the OPT and EAD application; the DSO was the only person who knew the date when the DSO submitted a student recommendation to the USCIS via

35

SEVIS; the DSO was required to prepare and give Faria the I-20 Certificate of Eligibility within three days after submitting the recommendation to the USCIS; the Regents gave him an I-20 Certificate of Eligibility stating May 9, 2018 as his deadline for filing his EAD application with the USCIS when the actual deadline the Regents had created by their recommendation submission was May 6, 2018, from which Faria had 30 days for his application to be filed with the USCIS; and the principal DSO acknowledged in letters to Ernst & Young and the USCIS that the school's erroneous instructions to students on how to complete the EAD application, which instructions Faria had followed, "contributed to the denial" of Faria's application by the USCIS.

These allegations—which, again, are all incorporated by reference into his two negligence causes of action as if they were set forth fully in them—indicate those causes of action are firmly rooted in allegations of *negligent misrepresentation*; the premise of both is that the Regents caused harm to Faria by negligently representing to him the wrong deadline by which he was required to file his EAD application with the USCIS. And there are more allegations. That is, Faria alleged in his second cause of action, for negligence under Government Code section 815.2, that the DSO breached a duty of care to him by setting the wrong date on Faria's I-20 Certificate of Eligibility for the filing of his EAD application with the USCIS. Faria repeats this allegation in the latter negligence cause of action, recasting it as a breach of a mandatory duty. The sum of these allegations indicates negligent misrepresentation lies at the heart of both negligence claims, however Faria has characterized them. As such they are barred by the government immunity provided in Government Code sections 818.8 and 822.2.

36

Our conclusion that we are to be guided by this gravamen of Faria's causes of action is well-supported by case law.  For example, in *Brown v. Compton Unified School Dist.* (1998) 68 Cal.App.4th 114 (*Brown*), a case the Regents heavily rely on, a college student sued his high school counselor and the school district after he lost his college scholarship.  (*Id.* at p. 115.)  The student alleged he had transferred to a district high school with the express purpose of satisfying NCAA basketball eligibility requirements and had followed certain advisements by the defendants that led to his college basketball ineligibility.  (*Id.* at p. 116.)  Brown's complaint incorporated by reference a letter from Brown's high school principal acknowledging Brown's failure was " 'completely the result of misadvisement on the part of one of our school's academic counselors' " (*ibid*), an allegation strikingly similar to Faria's recounting of his school's principal DSO acknowledging to Ernst and Young and the USCIS that Faria was misled by the school's erroneous instructions.  The trial court in *Brown* granted the defendants' motion for judgment on the pleadings and Brown appealed.  (*Ibid.*)

The appellate court affirmed.  (*Brown*, *supra*, 68 Cal.App.4th at p. 118.)  On appeal, Brown combined his actions for negligence and breach of contract, but the court concluded both sought redress for the same harm.  (*Id.* at p. 117.)  The "critical allegation" was that Brown lost his scholarship because of defendants' misadvisements.  (*Ibid.*)  Assuming a duty owed to Brown (an issue not relevant here), the court concluded the defendants were immune from liability for misrepresentation under Government Code sections 818.8 and 822.2.  (*Brown*, at pp. 117–118.)  Wrote the court, "Brown pled, in essence, that [the counselor] negligently misrepresented

that the science class in which she counselled him to enroll would meet NCAA eligibility guidelines." (*Id*. at p. 117.)

Similarly, in *Lundeen Coatings Corp.*, *supra*, 232 Cal.App.3d 816, relied on by the *Brown* court (*Brown*, *supra*, 68 Cal.App.4th at pp. 117–118), the plaintiff filed suit for money due for construction services rendered, and one of the defendants, the Department of Water & Power (DWP), argued that, as a public entity, it was immune from the plaintiff's tort claims. (*Lundeen Coatings Corp*. at p. 822.) The plaintiff appealed from the trial court's sustaining of DWP's demurrer without leave to amend. (*Ibid*.)

The plaintiff argued its tort claims were not based on any misrepresentation after the trial court had struck references to fraud and, therefore, were not subject to government immunity. (*Lundeen Coatings Corp.*, *supra*, 232 Cal.App.3d at pp. 832–833.) The court rejected this argument because "[c]learly the hybrid nature of the pleaded claims, which used the terms 'fraud' or 'fraudulently' repeatedly until the trial court struck those terms from the pleading, reveals that the very essence of these claims was *misrepresentation*. Plaintiff cannot now represent that those tort claims were based on conduct other than misrepresentation simply because the trial court has excised that language from the complaint." (*Id*. at p. 833, original italics.)

These cases establish that, regardless of how Faria has characterized his negligence causes of action, they are barred by government immunity under Government Code sections 818.8 and 822.2. As we have discussed, Faria argues his negligence causes of action must survive demurrer because they include the allegations that the Regents's agents failed in performing their "operational tasks" that did not include

38

misrepresentations. For example, he contends the Regents failed in their duty to monitor his application during a post-EAD application submission "grace period" and, as a result, did not discover their error, inform him of it, and take timely steps to correct it. But this alleged additional negligence extends from and is secondary to the Regents's "original sin," their negligent misrepresentation to Faria about the EAD application deadline, as no further action would have been necessary and no additional alleged negligence would have occurred but for that negligent misrepresentation. As a result, the "operational tasks" negligence Faria alleges is neither the gravamen of the negligence causes of action nor separable from the negligent misrepresentation. Negligent misrepresentation is the gravamen, and it precludes reversal here.

To sum up, Faria's creative pleading and argument cannot save his two negligence causes of action because they are rooted in allegations of negligent misrepresentation. Because the gravamen of Faria's negligence causes of action is negligent misrepresentation, the trial court did not err in sustaining the Regents's demurrer to those causes of action.[9]

### III. DISPOSITION

The trial court's order granting the Regents's Section 437c motion summarily adjudicating Faria's implied contract cause of action is reversed, and the order sustaining the Regents' demurrer to the negligence

---

[9] In light of our conclusion, we have no need to discuss the other issues debated by the parties regarding whether the trial court's demurrer ruling should be affirmed or reversed.

We also note that Faria does not seek leave to amend his complaint or argue that he can cure the defects we have discussed in Section II.C. by such amendment, and we see no such possibility.

39

causes of action is affirmed.  The parties are to bear their own costs of appeal.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
SIMONDS, J.*

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40